## BISSELL *v.* FOSS & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Argued March 11, 12, 1885.—Decided April 6, 1885.

There is no relation of trust or confidence between mining partners, which is violated by the sale and assignment by one partner of his share in the company assets and business to one or more of his associates, without the knowledge of the other associates.

The record in this case discloses no equitable reason why the defendants in error, who purchased the interest of third parties in a mine in which all were jointly interested with the plaintiff in error, should be held bound to share with the plaintiff in error the interest so purchased.

This was a suit in equity. The facts which make the case are stated in the opinion of the court.

*Mr. John F. Dillon* [*Mr. L. C. Rockwell* was with him on the brief] for appellant.

*Mr. David P. Dyer* for appellee.

. Mr. Justice Woods delivered the opinion of the court.

This was a suit in equity. The facts as they appeared by the pleadings and evidence were as follows: In January, 1878, two miners, named Davidson and Vanboxall, located a mining claim near Leadville, Colorado, which they called the Winnemuck. In March following they jointly conveyed to the appellant Bissell, and to the appellees Foss and Hunter, each a one-fourth interest in the property in consideration of their agreement to furnish money to sink a shaft to the ores on the claim. These parties worked the mine as mining partners until July, 1878, when Davidson and Boxall, with the consent of their associates, sold their one-fourth to three persons, Rawlings, Handley and Robertson, called in the record "The Missourians," who with Bissell, Foss and Hunter continued the working of the mine.

Tabor and Reische, who owned and worked a mine adjoining the Winnemuck on an alleged title not necessary to state, .claimed the ore from the Winnemuck mine, and instituted from time to time, attachment proceedings by which they seized the ore as it was taken from the mine. The associates who were working the Winnemuck mine procured the release of the ore, by giving forthcoming bonds, with one Halleck as security, who signed the bonds on condition that the money arising from the sale of the ore should be placed and kept in bank, as an indemnity to him until the ownership of the ore could be settled. On this understanding the proceeds of the sale of the ore were deposited in the Miners' Exchange Bank of Leadville.

In August or September, 1878, the owners of the Winnemuck, Bissell, Foss, Hunter, and the Missourians, having received from the sale of ore, money more than sufficient to indemnify Halleck, with the surplus bought and paid for an interest in the New Discovery Lode. About October 1, 1878, they had on deposit to their credit in the bank $16,000, and Halleck was bound for them to the amount of $12,000.

In the latter part of September the Missourians offered for sale their one-fourth interest in the mines. Bissell and Foss were

anxious lest the interest of the Missourians should fall into the hands of Tabor and Reische, who might thereby gain some advantage in their suits then pending. They had a conversation in reference to the purchase of the interest of the Missourians. They differ in their account of this conversation. It is thus detailed by Bissell:

"Along about the 30th day of September Mr. Foss came to my room and stated that the Missourians, as we termed them, were wanting to sell their quarter interest in the property, and had offered it for $30,000, and he said that he thought we had better go in and buy it. I said to him that it was all well enough to buy it, if they wanted to sell, but that I was confident that I could get it at better figures. I said, 'I am almost certain, Mr. Foss, that I can buy it for less; let me manage it and I think I can buy it for $15,000,' and went on to say what I would say to them concerning all the trouble and suits in the case. He said, 'Very well, if you can get it for that so much the better.' It was an agreement and understanding between us, that if we could get it for $15,000 we were to take it."

He further stated in reference to the same interview:

"We sat down there and made figures to see if we could pay for it out of the money belonging to the company in bank; and the result of our figuring was, that we couldn't do it to the full extent; that we could pay a portion of it from that money, and the balance outside, each of us raise our share."

In answer to the question, who were to have the interests in the quarter to be purchased of the Missourians, he said: "They were to go between us three, Trimble and Hunter, Foss and myself. Mr. Trimble and Hunter's were interests together; they owned jointly that quarter interest, so I was informed by Mr. Trimble and Mr. Hunter."

Foss gave the following account of his interviews with Bissell in reference to their project to buy out the Missourians:

"I met Dr. Bissell over Tribe and Jeffrey's store, in Leadville, and we talked the purchase over. I told him that the boys wanted to get out bad, and I thought they would sell pretty reasonable; but that as I was working about there managing the mine, he could do better than I could. I said

he had mentioned to us one night on the street $30,000 as a price, but that we wouldn't agree to for a moment. We wondered how we could do about the money for the purchase. If we could use the company money, we thought we must use a little more than our joint interest. Bissell was to see the boys in regard to it."

In answer to the question, "what was said about the price?" he replied:

"We talked the amount; $20,000 was spoken of. He thought that was too high and more than we should give. I thought so too, but $30,000 was the price fixed by them. That I wouldn't think of for a moment. We figured it over, but I don't remember the exact figures, and we concluded that at $15,000 we could pay for it, in case we could draw out the money in the Exchange Bank. Dr. Bissell thought it could be bought for less than $10,000. There was no proposition made for any definite price, but if we could buy the property we were to buy it together. He was to see what was the best he could do with it."

He was then asked to state "whether there was, up to the time you concluded the trade with Handley, any agreement with Dr. Bissell that you and he should buy that property for $15,000;" to which he replied, " No, sir."

After these conversations between Bissell and Foss, Foss and Hunter, early in October, 1878, purchased of the Missourians for $15,000 their interest in the Winnemuck and New Discovery Mines, and in the money of the associates on deposit in the Exchange Bank. The purchase was made in the name of Foss, but it was agreed between him and Hunter that Hunter was to have two-thirds and Foss one-third of the share. The money to pay for the share was all advanced by Hunter, Foss agreeing to reimburse Hunter the one-third. In order to induce the Missourians to sell at $15,000, Hunter declared to them that he was willing to sell his fourth to Foss for that sum, and actually made a pretended sale and conveyance to Foss at that price.

Bissell was not informed of the negotiations for the sale and purchase while they were going on, and Foss requested

Handley, the one· of the Missourians with whom he .treated for the purchase, not to tell· Bissell of the sale.,

After the purchase was completed Foss denied the right ·of Bissell to a one-third share of the interest sold by the Missourians.

Matters thus remained until November 16, 1878, when the Tabor party on one side, and Foss, Bissell and Hunter on the other, joined in a conveyance of their interests to B. M. Hughes, as trustee, to hold seventy-three out of one hundred equal shares.for the Tabor party, and twenty-seven for Bissell, Foss and Hunter; and, by agreement, the mines were to be worked and the moneys made deposited in the First National Bank of Denver, one of the appellees, and credited to the two parties in the proportions above stated. On April 2, 1879, there was on deposit in the bank to the credit of Foss, Bissell· and Hunter $92,502.58. It was in reference to the division of this fund that this litigation arose.

If there had been no purchase of the interest of the Missourians, Bissell, Foss and Hunter would each have owned three-twelfths of· this fund. · But Bissell, insisting that he was entitled to one-third of the one-fourth interest purchased of the Missourians, claimed four-twelfths. Foss and Hunter, insisting that Bissell had no interest in the share purchased of the Missourians, contended that he was only entitled to three-twelfths of the fund, and they jointly to nine-twelfths.

· Thereupon Foss and Hunter, on April 26, 1879, brought the present suit in equity against the First National Bank of Denver as the depositary, and against Bissell·as the adverse.claimant,· to recover nine-twelfths of the fund. The·bank answered the bill and at the same time· filed a cross-bill, in which it al-·leged that it was merely a stakeholder, claiming no interest in the fund, and praying that Foss, Hunter and Bissell might be required to interplead. Bissell answered both·the original and . cross-bills, claiming four-twelfths of the sum.

The sum in dispute between the. parties seems to have increased after the filing of the original bill, and before· final decree amounted to $36,454.35. This sum, by agreement.of . the parties, was deposited in the registry of the court, and they·

stipulated that the decision of the court should settle their rights, not only to the fund claimed in the original bill, but to the whole amount in the registry of the court.

On final hearing, the Circuit Court decreed "that Foss and Hunter were entitled to the $36,454.35 in controversy in the registry of the court, and that it be paid to them." From this decree Bissell appealed.

It is clear that the appellant had no claim to the fund in controversy, unless he had some title, legal or equitable, to the property which produced it. But he was not a party to the purchase of the property by Foss and Hunter. The Missourians, who owned the property, never bargained with Bissell to sell him any interest in their share, and never conveyed to him any interest in it. They contracted with Foss and Hunter only. Bissell never paid any part of the purchase money. It was paid exclusively by Foss and Hunter. His title, if he has any, is not based on any contract of purchase made with the Missourians, nor on any contract or understanding between him and Hunter. He bases his claim on the conversation and agreement between himself and Foss. This agreement, as stated by Bissell, was that Bissell and Foss should buy out the Missourians, for the benefit of themselves and Hunter, and divide the share equally between the three, and that each should pay one-third of the purchase-money. According to Bissell's own version, the arrangement was based on the expectation that a large part of the purchase-money could be paid out of the deposit of the parties in the bank. But the evidence shows that the money which they were at liberty to draw from the bank would pay less than one-third of the price at which the purchase was made. Foss testifies that all his individual resources consisted of a small grocery store not paying much, and that he "was just living in the hope of beating Tabor."

Looking at all the testimony it is impossible to reach the conclusion, unless we disregard altogether the evidence of Foss and rely entirely on that of Bissell, that there was any well-defined agreement between them to buy out the Missourians at a specified price, or that the two had available resources to

make the purchase. Nothing but an arrangement left at loose ends can be deduced from the evidence. But if the agreement had been clear and definite, it could bind neither Foss nor Bissell until Hunter was consulted and agreed to it. If Hunter declined, the matter was at an end, and there was no obligation on either Foss or Bissell to purchase for themselves or themselves and Hunter.

The record shows, and counsel for Bissell contend, that Foss told Hunter about the arrangement, in reference to the purchase, between himself and Bissell. There is no proof that Hunter assented to the arrangement made between Foss and Bissell. It is clear that he did not assent, for he made a different arrangement with Foss, by which he was to purchase and pay for two-thirds of the share of the Missourians, and Foss the other third, and by which he was to advance all the money to make the purchase, leaving the funds of the associates on deposit in the Miners' Exchange Bank untouched. It is plain, therefore, that the project of Foss and Bissell for the purchase, for the joint benefit of themselves and Hunter, of the share of the Missourians, fell through. It could not be carried out without the assent of Hunter, and he did not assent.

To show the fraudulent conduct of Foss and Hunter, stress is laid by counsel for the appellant on the fact that they deceived the Missourians by the pretence that Hunter was willing to sell, and that he did actually sell his one-fourth to Foss for $15,000, and thus induced them to sell at the same price. But as the Missourians were the only persons injured by this stratagem, if any one was injured, and they do not complain, we do not see how it concerns the appellant. The device by which Foss and Hunter made the purchase at $15,000 did not add to or detract from the rights of the appellant. And, as he is seeking to get the benefit of the contract thus fraudulently made, as he alleges, it does not lie in his mouth to complain of a fraud of which he is seeking to share the fruits.

Bissell had no ground upon which he could base any contract right to an interest in the purchase made by Foss for himself and Hunter. He paid no money on the purchase, and he could not have been compelled to pay any, either by the

Missourians with whom he had no contract, or by Foss, who, after Hunter had declined to acquiesce in the arrangement between Bissell and himself, could not have demanded of Bissell that he and Foss should buy for themselves. And if Foss had actually bought for himself and Bissell he could not have compelled the latter to pay his half of the purchase money, for Bissell had never agreed to such a purchase. The agreement could not bind Foss unless it also bound Bissell. Bissell therefore did not, by reason of his agreement with Foss, acquire any interest in the share purchased by Foss and Hunter of the Missourians.

But the appellant insists that there was a mutual agreement between Bissell and Foss that if either made the purchase it should be for the benefit of all, and that this agreement, although not amounting to a contract which could be specifically enforced if it had been made with a stranger, created between parties who sustained to each other the confidential and trust relations which existed between these parties a constructive trust which would be enforced in equity.

The contention is that these three parties were in such relations to each other that, if one bought a share in the common property and business, it enured in equity to the benefit of all, subject to the payment by each of the associates of his share of the purchase money. The relations from which this result springs are stated to be those, first, of joint tenants, and, second, of partners; and that, by reason of these relations, Foss and Hunter became trustees for themselves and Bissell in purchasing the share of the Missourians.

It is true that one of two or more tenants in common, holding by a common title, cannot purchase an outstanding title or incumbrance upon the joint estate for his own benefit. Such a purchase enures to the benefit of all, because there is an obligation between them, resulting from their joint claim and community of interest, that one of them shall not affect the claim to the prejudice of the others. *Rothwell* v. *Dewees,* 2 Black, 613; *Van Horne* v. *Fonda,* 5 Johns. Ch. 388; *Lloyd* v. *Lynch,* 28 Penn. St. 419; *Downer* v. *Smith,* 38 Vt. 464.

But this rule cannot apply to Hunter and Foss. They

purchased no outstanding title or incumbrance to the prejudice of the other tenant in common. They did what any tenant in common with entire good faith might do, namely, purchased the interest of some of their co-tenants without consulting the others. The title which they purchased of the Missourians was not antagonistic or hostile to the title of Bissell. Their purchase did not in any degree tend to injure or damage his interest. His share was just as valuable after as before the purchase, and his rights were the same. In such a purchase no trust or confidence is violated.

Nor do we think that the relations of the parties as partners prohibited Foss and Hunter from making the purchase in question for their own benefit to the exclusion of Bissell. The association of Bissell, Foss, Hunter and the Missourians was not an ordinary partnership. It was what is known as a mining partnership, which is a partnership *sub modo* only, and is thus described by Mr. Justice Field in *Kahn* v. *Smelting Co.*, 102 U. S. 641:

"Mining partnerships, as distinct associations, with different rights and liabilities attaching to their members, from those attaching to members of ordinary trading partnerships, exist in all mining communities; indeed, without them successful mining would be attended with difficulties and embarrassments much greater than at present." He then quotes a passage from the opinion in *Skillman* v. *Lockman*, 23 Cal. 199, 203, to the effect that a mining partnership is governed by many of the rules relating to ordinary partnerships, but also by some rules peculiar to itself, one of which is, that one person may convey his interest in the mine and business without dissolving the partnership, and then proceeds as follows: "The same doctrine is asserted in numerous other cases, not only in that court, but in the courts of England. Associations for working mines are generally composed of a greater number of persons than ordinary trading partnerships; and it was early seen that the continuous working of a mine, which is essential to its successful development, would be impossible, or, at least, attended with great difficulties, if an association was to be dissolved by the death or bankruptcy of one of its members, or the as-

signment of his interest. A different rule from that which governs the relations of members of a trading partnership to each other was, therefore, recognized as applicable to the relations to each other of members of a mining association. The *delectus personæ*, which is essential to constitute an ordinary partnership, has no place in these mining associations. *Duryea* v. *Burt*, 28 Cal. 569; *Settembre* v. *Putnam*, 30 Cal. 490; *Taylor* v. *Castle*, 42 Cal. 367."

This case settles two propositions: first, that the members of a mining association have no right to object to the admission of a stranger into the association who buys the share of one of the associates; and, second, that the sale and assignment by one of the associates of his interest does not dissolve the mining partnership. It follows from these propositions, that one member of a mining partnership has the right, without consulting his associates, to sell his interest in the partnership to a stranger, and that such a sale injures no right or property of the other associates. Much less does a purchase by one associate of the share of another inflict any wrong upon the other members of the partnership. There is no relation of trust or confidence between mining partners which is violated by the sale and assignment by one partner to a stranger, or to one of the associates, of his share in the property and business of the association.

It results as a conclusion from these premises, that Bissell has suffered no wrong at the hands of either Hunter or Foss, on the ground that they were his tenants in common or partners, by reason of any contract made between the latter in reference to the purchase of the share of the Missourians in their joint enterprise. There has been no violation of any trust and confidence arising from the relations existing between Bissell, Foss and Hunter.

The appellant, it is therefore clear, cannot demand any part of the two-thirds interest purchased by Hunter in the share of the Missourians. If he is entitled to participate in any way in the purchase made by Foss and Hunter, it can only be in the one-third interest purchased by Foss. But this demand cannot be based on any contract between Bissell and Foss, for the contract arrangement between them was conditioned upon the

consent of Hunter, and Hunter did not consent. It was also an element of the agreement, that the money of the associates on deposit in the bank should be sufficient and should be available to pay a large part of the money required for the purchase of the share of the Missourians. But this condition also failed. He was, therefore, bound by no contract with Bissell to make the purchase.

The only question which remains is, was Foss bound, when he learned that the arrangement he had made with Bissell for the purchase of the share of the Missourians could not be carried out, to inform Bissell of the fact, and give him a chance to join in the purchase made by him and Hunter? It cannot be denied that, under the circumstances, there was an obligation on Foss to inform Bissell of the failure of their plan before making another with a third person. But it was not a legal obligation capable of enforcement *in foro externo*, but only a natural obligation to be disposed of *in foro conscientiæ*. Story Eq. Jur., § 2. It was one of those obligations which was binding on the honor and conscience of the party, but one not the subject of a suit and not to be enforced in a court of either law or equity.

We are of opinion that the decree of the Circuit Court was right. It is therefore

*Affirmed.*

Mr. Justice Bradley and Mr. Justice Matthews dissented.