## Richmond

### EGGBORN v. SMITH.

March 20, 1913.

1. LAND—*What Constitutes—Loose Rocks—Dump From a Railroad Cut—Personalty.*—Earth, rock, etc., removed from a railroad cut and placed upon the land of another with his consent, with the intention of the railroad company that it shall remain there permanently and become the property of the owner of the land, is a part of the land upon which it is so placed, and passes with a deed from the owner thereof to the grantee if no reservation is made. The unexpressed intention of the owner to treat it as personalty, or his attempt to sell it as such, of which his grantee had no notice, cannot affect the title of the grantee of the land upon which such materials were placed.

Error to a judgment of the Circuit Court of Culpeper county in an action of detinue. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The following instructions were given on motion of the plaintiff:

"No. 1. The court instructs the jury that, to convert a chattel into a real fixture, the person making the annexation must intend to make such chattel thereby a permanent addition to the realty, such intention being evidenced by the manner in which the fixture is annexed, its adaptability to the use to which the land was being put, and the conduct of the party with respect thereto; and if the jury believe from the evidence that the Southern Railway Company severed the rock in controversy from its land, and hauled the same and piled it upon the land of S. R. Smith, and agreed with said Smith that, upon the completion of its

work at that place, the said rock should become the property of the said Smith, then, until the completion of the said work, the said rock were the personal property of the railroad company upon the land of said Smith; and if the jury further believe from the evidence that Smith, when he so acquired the said rock, did so without intending to permanently annex and make them a part of his land, but intended to hold them for sale or use as material for ballast, road building, or other like purpose to which they were adapted, and if they further believe from the evidence that said rock had been blasted and shivered, and in their then condition were suitable for and adapted to such use, rather than for the purposes for which the said land was being used, and that the conduct of said Smith with respect to said rock was consistent with his said purpose, then the said rock became and were his personal property, and did not pass under the subsequent conveyances of said land through which the defendant claims, and they should find for the plaintiff.

"No. 2. The court instructs the jury that one of the potent facts to be considered as indicating the intention of the annexor, and as determining the character of the article as a fixture or not, is its character as related to the uses to which the land has been appropriated, it being regarded as a fixture only in case it is in its character adapted to the use to which the land is devoted; and in determining whether or not S. Russell Smith intended that the rock in controversy should become a part of his land, or be used and disposed of as personal property, they should take into consideration the previous character and condition of said land, and the use to which it was put, the adaptability of said rock to the purposes for which said land was being used as compared with their adaptability for use as personal property; and if they believe from the evidence that said rock were not adapted to the purposes for which the land was being used, but were adapted to use as personal

property, the presumption is that they were personal property intended for the use to which they were adapted.

"No. 3. The court instructs the jury that if they believe from the evidence under the instructions of the court that the rock sued for were personal property when placed on the land of S. R. Smith, the burden of proof is on the defendant to show, by a preponderance of evidence, that they were converted by him into real estate.

"No. 5. The court instructs the jury that if they believe from the evidence under the instructions of the court that the rock sued for were personal property, the owner thereof had the right to hold the same until such time as in his judgment it was to his interest to dispose of them or make use thereof, without being deemed to have converted the same into real estate; and the mere length of time which he has so held them upon his land is not of itself sufficient to rebut the presumption that they are personalty, or to prove a conversion thereof by him into real estate.

"No. 6. The court instructs the jury that if they believe from the evidence that it was apparent from an inspection of the rock sued for, as piled upon the lands of S. R. Smith, that said rock were not originally a part of said land, but had been severed and brought from the land of another and piled upon the land of said Smith, and that said rock were in no way adapted to the use which was being made of said land and were only suitable for use as personal property, such as material for ballast, road construction and the like, the presumption would be that said rock were personal property and purchasers of said land would be affected with notice of the facts which an inspection of the property itself disclosed, as well as of such facts as by the use of ordinary care and diligence they might have obtained knowledge of."

The following instructions tendered by the defendant were *refused:*

"No. 1. The court instructs the jury that land signifies any ground forming a part of the earth's surface, whether soil or rock or water covered; that it is the solid material of the earth, whatever may be the ingredients thereof, whether soil or rock or other substance, and if you believe from the evidence that the Southern Railway Company, or H. H. Thrasher & Company, acquired of S. Russell Smith the right to place upon the lands then owned by him earth and rock taken from a railroad cut near by, with the understanding that the said earth and rock, when so placed, should be the property of the said Smith, and that in pursuance of the said contract, the said Southern Railway Company, or H. H. Thrasher & Company, did place upon the lands of the said S. Russell Smith rock and soil, whether intermingled or not, then the said rock and soil became a part of the lands of the said Smith upon which placed, and passed as land under the deed of trust to John B. Miller, trustee, and is real estate in the hands of the purchaser from the said trustee and cannot be recovered in this suit.

"No. 2. The court instructs the jury that if they believe from the evidence that the said S. Russell Smith got from the Southern Railway Company $1,100 for the right to pile the waste from the railroad cut upon his lands, and for the temporary use of a portion of his land as a right of way, then the adaptability of the said waste for the uses of the said land is not to be considered by the jury in ascertaining whether the said Smith intended to use such waste as real estate or personal property.

"No. 3. The court instructs the jury that if they believe from the evidence that the Southern Railway Company acquired from S. Russell Smith the right to waste rock and earth taken from the cut being excavated by it upon the land of the said Smith, and did so waste the said rock and earth, piling it in different piles with the understand-

ing that same should be the property of the said Smith, then the said rock and earth became a part of the real estate upon which placed, and would pass as such, unless same was reserved, under a deed for the said real estate, unless said Smith did some act other than talking of selling it to show he intended to utilize it as personal property.

"No. 4. The court instructs the jury that rock, in the common acceptation of the term, is real estate, and where land is conveyed with rock located thereon, unless the rock is reserved on the face of the deed, it passes to the grantee in the deed along with the land conveyed, and this is true whether the rock is piled up or scattered over the land conveyed.

"No. 5. The court further instructs the jury that if S. R. Smith claimed the rock at the time of the conveyance from himself to J. B. Miller, trustee, he should have notified the said Miller of his claim at the time of the conveyance to him, and if he failed to do so the rock passed to Miller, trustee, under the deed conveying the land as a part of the land; and the burden is upon the plaintiff to show by a preponderance of the evidence that such notice was given; and this is true notwithstanding the jury may believe the rock was personal property.

"No. 6. The court instructs the jury that if they believe from the evidence that the Southern Railway Company acquired of S. Russell Smith the right to waste its rock and material taken from the railroad cut near the land of the said Smith upon the said land, with the understanding that such waste material was to be the property of the said Smith after the railroad company had finished therewith, and did so place same upon the land, and the said Smith had in his mind an idea that he might thereafter be able to sell and dispose of the said material at some future date, if he got a price satisfactory to himself, and

would not sell unless he did get a satisfactory price, then there was no fixed determination in his mind to remove the material from the land except in the contingency of obtaining a satisfactory price therefor, and he cannot be said to have intended it as personal property unless he could get a price at which he was willing to sell it.

"No. 7. The court instructs the jury that if they believe from the evidence that the rock in the declaration mentioned is a pile covering an acre or more of land, such pile consisting of earth, rock dust, and rock of all sizes from the most minute particle up to rock taking several men to lift, and from an inspection of the rock and the land adjoining, that this pile of material is evidently waste from a deep railroad cut, and that it had lain upon the land in question from the time of its excavation from the said cut in 1903 or 1904 without being disturbed in any particular to the time of the conveyance of S. Russell Smith to John B. Miller, trustee, then the said rock and other material therewith mixed is presumably real estate, and the burden is upon the plaintiff to show that he did some overt act or acts of which the defendant had notice, or the public generally could have seen, indicating an intention to remove the said rock and use it as personal property.

"No. 8. The court further instructs the jury that if they believe from the evidence when the land on which the rock in question is located was conveyed to J. B. Miller, trustee, it was piled or scattered over from an acre and a half to two acres of the land conveyed, and from two to ten feet deep, with an annual growth of grass, weeds and vegatation thereon, then, unless they believe from the evidence that the appearance of the rock pile itself was sufficient to put a reasonable man on notice that the said rock was claimed as personal property, they must find for the defendant; and this is true notwithstanding they further believe from the evidence that the said Smith did claim the rock as personalty and treated it as such."

The opinion states the case.

*Grimsley & Miller,* for the plaintiff in error.

*Waite, Perry & Jeffries,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The subject of this controversy is a lot of earth, dust and rock, from the smallest particles to rock weighing several hundred pounds, distributed over about two acres of land, in various depths from a foot or two to eight or ten feet; and the facts out of which the controversy arises are as follows:

In 1903 and 1904 the Southern Railway Company was engaged in double-tracking its railroad through the county of Culpeper, and in so doing it became necessary for it to excavate a very deep and long cut just south of the town of Culpeper, a portion of the right of way for the new track having been purchased by the company of S. Russell Smith. In the construction of its new track it became necessary for the company to temporarily change a county road, and to provide a place on which to deposit the earth and other materials to be removed from the new cut. For these purposes the company entered into a written contract with Smith, through A. N. Peyton, one of its agents, whereby, in consideration of the sum of $1,100 paid him, Smith granted to the company the privilege of using a strip of his land to be used by the public as a road during the construction of the company's work, and also the right to use and occupy certain other portions of the lands of Smith upon which the company's contractors and employees might dump the stone and dirt to be taken from the cut near his land, and for other purposes in carrying out the company's work of double-tracking its roadbed. This con-

tract further stipulated that the road to be used tempo-
rarily by the public over Smith's land was to be restored
to its former location upon the completion of the said cut.

In making the cut the first material taken was princi-
pally earth, which was hauled by cars and dumped in part,
at Smith's request, so as to fill and somewhat grade an
old road upon Smith's land, and the residue of the earth
was placed upon the side of a hill. After working down
into the cut those engaged in its excavation came to a
stratum of almost solid rock, which had to be blasted with
dynamite, and after being so blasted was hauled out by
means of tram cars, drawn by mules, and evenly spread or
dumped in a little valley between two hills below where
the earth taken from the cut was deposited, upon Smith's
land, the earth and rock together covering about two acres
of the land adjacent to the company's right of way, and
filling certain hollows and low places in the land, the rock
at some points in the hollows and low places being piled
above the original surface of the land eight or ten feet,
while at other places the material was so scattered or
placed that it was only one or two feet deep, the top of
all presenting a comparatively level surface.

The work on the cut was completed in 1904, and the rock
and earth therefrom has remained where placed upon the
land of Smith without being disturbed, a great deal of the
rock having disintegrated, and over which vegetation has
grown, finding root in the earth mingled with the rock
and soil by the disintegration of the rock itself.

In 1909 Smith executed a deed of trust to John B. Miller,
trustee, on the tract of land on which the waste material
taken from the railway company's cut had been deposited,
securing certain of his creditors, but no reservation of the
material so deposited was made in this deed of trust, which
deed covered the entire tract of land, containing about
sixty acres, and certain other property of Smith's located

in the town of Culpeper.  Under the deed, Miller, trustee, advertised and sold on November 20, 1909, the said tract of land as well as the property in the town of Culpeper. Smith, who it seems represented Mrs. Smith then and theretofore in all business matters, attended the sale of the property in the town, but not the sale of the tract of land upon which the waste from the railroad cut had been deposited, although the sale was made on the same day and about an hour after the sale in the town, and the distance between the tract of land and the town property being about a mile, both sales being made on the premises. Instead of attending the sale of the tract of land, Smith wrote a letter the evening before to Miller, trustee, cautioning him to make the sale according to the terms, etc., of the trust deed, and to settle his accounts as trustee, according to law, showing what disposition he made of the purchase money; but in the letter no mention was made of the rock or other material deposited on the land.

On the morning of this sale Smith executed a deed to his wife, M. E. R. Smith, in which he claimed said waste to be his personal estate and undertook to convey it to her, which deed was not recorded until four days after the sale, and Smith, although he knew the land was to be sold that day, gave no notice of the deed from himself to his wife, and allowed the land, with the deposit of rock, etc., thereon to be sold; nor did he intimate to anyone interested in the sale his intention to claim the rock as personal property.  At the sale of the land John M. Colvin became the purchaser, but afterwards assigned his purchase to the Culpeper National Bank, to which the trustee made a deed.  Afterwards, on April 12, 1912, the said bank conveyed said land to E. J. Eggborn.

Mrs. Smith, to whom her hsuband, S. Russell Smith, undertook to convey said rock on November 20, 1909, made no effort to remove the same, or assert any claim thereto,

48

until a corporation in which E. J. Eggborn is interested secured a contract for macadamizing the streets of the town of Culpeper and began to use said rock, etc., in so doing; whereupon Mrs. Smith instituted this action of detinue to recover of Eggborn the said rock or the value thereof, claimed by her to be $16,000; and at a trial of the cause the jury, under the instructions of the court, rendered a verdict in favor of the plaintiff for $2,500, which verdict the court refused to set aside, and entered judgment thereon, to which judgment this writ of error was awarded the defendant.

The question presented is one of the first impression in this State, and has been passed on in only a few cases by the courts in other jurisdictions, so far as the reported cases show.

It has been put beyond question by the authorities, with little or no dissent, that rock naturally is a part of land, just as are all other substances from which the earth in its comprehensive sense is formed; therefore, the precise and controlling question to be considered in this case is whether the rock in dispute has lost its character as real estate by being blasted and taken from the particular land where placed by the hand of nature, and deposited, commingled with earth, upon other land.

The contract between the railway company and S. Russell Smith, under which the former acquired the right to place the waste material from its cut upon the latter's land, reserved no interest in this waste or any part thereof to the railway company, nor is there anything in the contract to indicate that the use to be made of the land as a dumping ground for this material was to be temporary only; the word "temporary" being used in the contract only with reference to the road secured under the contract over Smith's land for the use of the public until the work of the railway company double-tracking its road at

that point was completed. Smith testified that it was agreed *de hors* the contract between him and A. N. Peyton, acting for the railway company, that the company was to use such portion of the material placed upon the land of Smith as it saw fit for ballast; but this privilege given the company was to be exercised, if at all, while the company was double-tracking its road through the cut, and was to expire when the work was completed, which was the case eight years before this suit was brought; so that there is nothing in the written contract itself, or the alleged oral agreement between Smith and Peyton, to indicate an intention on the part of these parties other than that of leaving permanently upon Smith's land such material as the company deposited thereon which had not been used by the railway company for ballast before the completion of its work in the cut.

That Smith could not by a mental process make such material real estate or personal property at his option, as seems to be contended by the plaintiff, is too clear to admit of argument.

It is the contention of the plaintiff that in order that the rock, etc., deposited on Smith's land may become annexed thereto as a part of the land, the annexation must have been made by Smith and not by the railway company; that the appearance of the rock was such that purchasers of the land would be affected with notice of the facts which an inspection of the property disclosed, as well as of such facts as by the use of ordinary care and diligence they might have obtained knowledge of; that it was a question for the jury to decide whether or not the character and appearance of the rock itself was sufficient to put Miller, trustee, and purchasers claiming under him, on notice; it being conceded that even though it was intended by Smith that the rock should be personal property and he talked with the railroad officials about selling it to the railroad,

the title to the rock passed with the land to Miller, trustee, unless Miller at that time, or prior thereto, had notice, actual or constructive, that Smith claimed the rock as personalty. In other words, the plaintiff invokes as applicable to the facts of this case, not only the doctrine of the law as to constructive notice, but the law with respect to fixtures annexed to a freehold.

On the other hand, the defendant contended in the lower court, and contends here, that the doctrine as to constructive notice has no application to the case; that when the railway company placed the rock in question, which in its nature was real estate, upon Smith's land, with no intention of ever reclaiming it, it became thereby a part of the real estate on which placed; and that as Miller, trustee, did not have actual notice, or notice appearing of record, that the rock was claimed by Smith as his personal property, the title to the rock passed with the land to Miller, trustee, and by successive conveyances to the defendant.

The trial court adopted the view of the case contended for by plaintiff, rejecting that of the defendant on all material points, and instructed the jury accordingly.

We do not deem it at all necessary to review here the instructions given for the plaintiff or those asked by the defendant and refused.

In *Blowett* v. *Tregonning,* 111 Eng. Rep. (Ad. & El. Reprint) 524, the opinion by Patterson, J., says: "I am of opinion that when anything in the nature of soil is blown or lodged upon a man's close, it is a part of his close. * * * It can, we think, make no difference whether by evulsion or alluvion, or other actions of the elements, the soil of one person is transferred to the land of another, or is placed there by the voluntary act of the former owner, with the consent of the other party, with the intention of leaving it there permanently."

The only cases to which we have been cited or have been

able to find exactly in point here are *Lacustrine Fertilizer Co.* v. *Lake Guano Co.,* 82 N. Y. 470, and *Ellis* v. *Wren,* 84 Ky. 254, 1 S. W. 440.

In the first-named case the subject of the controversy was a deposit or bank of marl which had been excavated in making a channel to turn the water of the Canandaigua river for canal purposes through the land of one Torrey, which marl had been deposited on his land. The marl underlaid a stratum of muck about four feet in depth, and in removing the soil from the excavation, the muck was thrown out, and the underlying marl was afterwards excavated and deposited over the muck on the banks of the cut, and the mounds of muck and marl made by the deposit remained undisturbed until 1865, when Torrey, who had remained owner of the land, on January 6, 1865, conveyed his farm, including the land on which the marl had been deposited, to one Spaudling, by warranty deed containing this exception: "Excepting the bed or deposit of marl on both banks of the Canandaigua river which passes through said land; and it is an express stipulation and agreement between the parties hereto that the said marl may remain on said land for ten years from the date of this indenture, and that the party of the first part may, at any time, within said ten years, remove a part or the whole of said marl."

The opinion in that case, in disposing of the question involved in the case we now have in judgment, said: "When this conveyance was made the marl was part of Torrey's land. It was a part of the soil when excavated, and its character as land was not changed by reason of its displacement from the bed it originally occupied, and its deposit on the land of Torrey. It was not deposited with a view to removal. The value of the marl as a fertilizer was not known until about the time of Torrey's conveyance to Spaudling. It was not severed from the land as timber trees cut by the owner, or as coal or minerals mined and deposited on the surface, with a view to sale

as chattels.  By the deposit it became incorporated with and a part of the soil where it was deposited, and after as before the deposit it was a part of Torrey's freehold.  It does not appear that the State, before cutting the channel, had acquired the title through which it was made.  But if that fact had been shown, it would not, we think, have changed the conclusion that the marl when deposited became a part of the land on which it was placed.  Soil removed from the land of one person and placed upon the land of another by his consent, without any intention on the part of the former to reclaim it, or any agreement authorizing him to remove it, becomes a part of the land of the latter."

The opinion further says: "The position and rights of Torrey under the deed were, we think, precisely similar to what they would have been if Spaudling had owned the land and had granted to Torrey the beds of marl, with the same right of removal as is contained in Torrey's deed. The exception was of an interest in the land conveyed, but it was an interest terminable at the expiration of the ten years.  It was in legal effect a reservation to Torrey of so much of the marl as he should remove from the premises within that time.  If the right of removal was not exercised within the time limited, the right was gone, and Torrey's grantee would thereafter hold the land and the marl, relieved from the burden created by the exception."

In other words, the court held that the marl not having been removed within the ten years it became and thereafter remained a part of the land itself, as though there had been during the ten years a severance of the title to the marl from that to the land itself.  So that, if there was, as Smith testifies in this case, an agreement between him and Peyton that the railway company might take and remove a part of the rock in question for use as ballast in the completion of the work it was then doing in the cut,

when that work was completed, as it was eight years or more before this suit was brought, the alleged agreement between Smith and Peyton terminated and the rock was to be thereafter regarded, with respect to its relation to the land upon which it had been deposited, as though said agreement had never been made. The alleged agreement between Smith and Peyton, therefore, cannot avail the defendant in this case, and she has to rely upon the doctrine of "constructive severance," which cannot be applied in a case like this to defeat the rights of subsequent purchasers, under the recording acts. *Lacustrine Fer. Co.* v. *Lake Guano Co., supra.*

It is true that Smith also testifies as to certain efforts he made to sell the rock to the railroad company, and as to certain uses he had in his own mind purposed to make of the rock as personalty; but if all this be true it could not by any process of reasoning avail to affect the rights of Miller, trustee, or those claiming under him with respect to the rock in question, since it is not pretended that they or either of them had any knowledge of Smith's efforts to sell the rock, or of any purposes evolved in his own mind as to what uses he would make of it.

In *Ellis* v. *Wrenn, supra,* the controversy was with respect to the stones which had been in large quantities picked from the land of the testator and moved from their original location and placed in long piles or heaps and there remained. The stones afterwards became valuable, and the executor undertook to sell them as personal property, and the right to do so was by the heir contested, and the court held the stones to be a part of the real estate upon which they were piled or heaped, and therefore the property of the heir.

The learned counsel for the plaintiff cite cases to support the proposition that Smith alone could have annexed the rock in question to his land so that it would have

become real estate; and in this connection other cases are relied on dealing with the question of "fixtures," how and when they become affixed to the freehold as a part thereof; but these cases can have no application whatever to this case. It is inconceivable how real estate can be annexed to real estate except by depositing the one upon the other or intermingling the two.

When the land in this instance was conveyed to Miller, trustee, for the benefit of Smith's creditors, he was at that time in a position to protect Miller and subsequent purchasers of the land by reserving title to the rock in question; but this he did not do; nor did he disclose to Miller then, or to those claiming title under Miller thereafter, a purpose on his part to treat the rock as personalty until this suit was brought.

The authorities are in unison that the law cannot prefer the claims of those who take no care of themselves to those who have faithfully used all diligence. If a loss is to be sustained, it is more reasonable that he who neglected the means the law puts into his power should suffer, rather than he who has used those means. *Lacustrine, &c.,* v. *Lake G. Co., supra, Prince* v. *Case,* 10 Conn. Rep. 375, 27 Am. Dec. 675; *Powers* v. *Dennison,* 30 Vt. 752; 13 Am. & Eng. Enc. L. 627.

As opposed to the view taken in the cases of *Lacustrine, &c.,* v. *Lake G. Fert. Co.* and *Ellis* v. *Wren, supra, Fulton* v. *Norton,* 64 Me. 410, is cited for the defendant; but the facts in that case are wholly dissimilar to the facts in this case. There the owner of the freehold had sold the loose rocks on his land, and they had been gathered and piled near a navigable water course for the purpose of transportation. They had been severed from the freehold and the title thereto had passed from the owner of the freehold, thereby working an actual as well as a constructive severance, and had been converted into personal property of

another party. In this case the facts are the reverse. Here the rock had been removed from its original position, placed, together with earth and other materials, upon the land of another with the intention on the part of the party so placing the material that it should remain there permanently and be the property of the owner of the land, thereby making the material, including the rock, a part of the land.

With respect to the contention that this rock was not adapted to use as real estate, but was adaptable for macadamizing and concrete purposes, the answer is that this is true of all rock, whether naturally imbedded in the land or lying loose upon its surface. Rock of itself will not support vegetation, and has no agricultural value; yet upon land it is a part of it and passes with the title of the land. This rock was no more adapted to macadamizing purposes than any other like rock. It, according to the testimony of Smith, the leading witness for defendant and the former owner of the land, would have to be re-quarried, crushed and graded before it could be utilized for macadam, concrete, or ballast, which is true of all rock, and, therefore, it cannot be said that this rock was more adapted to use as personal property than as real estate.

It may be asked in this connection for what was the $1,100 paid by the railway company to Smith, if not, in large part, for the right to deposit the earth, rock, etc., upon Smith's land, there to remain permanently, thus changing the surface of the two acres of the land upon which the deposit was made, and rendering it less adaptable to the uses that had been made of the land theretofore? The record does not disclose an answer to this question and none occurs to us.

We are of opinion that the trial court erred in giving instructions for the plaintiff opposed to the views expressed in this opinion, and also erred in refusing instruc-

tions asked by the defendant which conform to those views; therefore, its judgment complained of has to be reversed, the verdict of the jury set aside, and the cause remanded for a new trial.

*Reversed.*