**LONDON EXTENSION MINING CO. et al.
v. ELLIS et al.**

No. 2605.

Circuit Court of Appeals, Tenth Circuit.

March 2, 1943.

406

Henry McAllister, of Denver, Colo., for appellants.

J. G. Holland, of Denver, Colo. (David K. Tone, of Chicago, Ill., was with him on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Orison Ellis, Ellen W. Ellis, Ida McGowan, and Buena V. Ellis, by Orison Ellis, her guardian and next friend, brought this action against the London Extension Mining Company,[1] Chicago Mines Company,[2] Harry C. Bishop, A. E. Moynahan, and R. W. Fraser to recover damages for alleged conversion of ores and minerals contained in a dump, commonly known as the American Dump.

---

[1] Hereinafter called London.    [2] Hereinafter called Chicago Company.

London and the Chicago Company are Colorado corporations. The latter is a wholly-owned subsidiary of the former.

The American, Huron, Fraction, and Ibex mining claims are situated in the Alma Mining District, Park County, Colorado. London owns an undivided $\frac{1}{2}$ interest in the American. The remaining undivided $\frac{1}{2}$ interest is owned as follows: Orison Ellis, $\frac{5}{48}$, Ellen W. Ellis, $\frac{5}{48}$, Buena V. Ellis, $\frac{8}{48}$, Buena V. Ellis, $\frac{4}{48}$, Ida McGowan, $\frac{2}{48}$.

London owns an undivided $\frac{1}{2}$ interest in the Huron, Fraction, and Ibex claims. The other undivided $\frac{1}{2}$ interest therein is owned by the London Mines & Milling Company.

William A. Ellis, Jr., organized the Amer Mining Company[3] under the laws of Colorado.

On August 20, 1930, Orison Ellis gave a lease to William A. Ellis, Jr., of an undivided $\frac{4}{48}$ interest in the American. On December 7, 1931, Orison Ellis gave a lease to the Amer Company of an undivided $\frac{1}{48}$ interest in the American. On August 20, 1930, Aline Ellis, predecessor in interest to Buena V. Ellis, gave a lease to William A. Ellis, Jr., of an undivided $\frac{8}{48}$ interest in the American. On August 20, 1930, Thomas A. Ellis, predecessor in interest to Ellen W. Ellis, gave a lease to William A. Ellis, Jr., of an undivided $\frac{4}{48}$ interest in the American. On December 18, 1931, Thomas A. Ellis, predecessor in interest to Ellen W. Ellis, gave a lease to the Amer Company of an undivided $\frac{1}{48}$ interest in the American. It will be observed that these leases covered only $\frac{18}{48}$ of the American and did not include the $\frac{2}{48}$ interest owned by Ida McGowan and $\frac{4}{48}$ owned by Buena V. Ellis. The leases ran from their respective dates to August 20, 1940. They granted to the lessees the right to prospect and mine the American and to extract ores therefrom and provided that the lessees should pay to the lessors as royalty 20% of the net smelter returns on all ores extracted and sold from the premises. The first-mentioned lease contained the following provision: "* * * that the lessee shall occupy and hold all side veins, spurs, feeders, cross lodes, parallel lodes or mineral deposits of any kind which may be discovered by the lessee within the leased premises as the property of the fee owners, according to their proportionate interest in the property; the lessee agrees not to allow any person not in privity with fee owners, or parties hereto, to take or hold possession of said premises, or any part thereof."

The remaining leases contained substantially the same provision. Each gave the lessee the right to assign the lease.

On September 9, 1930, London gave a mining lease to William A. Ellis, Jr., of an undivided $\frac{1}{2}$ interest in the American.

On March 31, 1931, William A. Ellis, Jr., assigned to the Amer Company all of his interest in the leases running to him. On or about December 28, 1934, the Amer Company assigned all its interests in the leases to W. A. Ellis, Inc.

In 1931, the American was largely undeveloped. The course of the apex of the vein could not then be accurately determined. It was uncertain whether the apex of the vein extended through the length of the American claim or through the length of the Fraction claim. The extralateral rights, if any, accorded by Federal statute[4] could not then be determined. To avoid controversy, a compromise agreement was entered into September 29, 1931, between the owners and lessees of all the claims, except Buena V. Ellis as to a $\frac{4}{48}$ interest and Ida McGowan as to a $\frac{2}{48}$ interest in the American, wherein the mining rights and interests of the parties were fixed. Under this agreement a compromise area was described as comprising that portion of all the claims bounded on the east by the easterly side line of the American and on the north and south by the American end lines extended westerly through the Huron, Fraction, and Ibex claims. This area was divided into blocks of ground, known as A, B, C, D, and E, respectively. Under the agreement, it was provided that blocks A, B, and C should be mined by the Amer Company as lessee of the owners of the American who joined in the agreement, and that blocks D and E should be mined by the lessee of the owners of the Huron, Fraction, and Ibex claims. It contained provisions with respect to the division of the net proceeds from ores extracted from blocks C, D, and E. Under date of August 4, 1933, a supplemental agreement was entered into, the principal purpose of which was to eliminate the provisions respecting division of the net proceeds from certain

---

[3] Hereinafter called the Amer Company.

[4] 17 U.S.Stat. at L. 91, 30 U.S.C.A. § 26.

of the blocks. The effect of these two agreements was to vest in the owners of the American, who joined in the agreements, all right, title, and interest of the owners of the Huron, Fraction, and Ibex claims in and to the ores and minerals in blocks A, B, and C, subject to their leases held by the Amer Company, which was to operate the property thereunder and to vest in the owners of the Huron, Fraction, and Ibex all right, title, and interest of the owners of the American who joined in the agreement in and to the ores and minerals in blocks D and E.

The American Dump was created from waste material produced by the lessees of the American in the operation of the blocks assigned to the owners of the American, except Buena V. Ellis and Ida McGowan. All ores or other material removed in the operation of the Huron, Fraction, and Ibex by their owners or lessees from the blocks assigned to them were transported through other underground passages and did not enter the American Dump.

In the mining of a metalliferous vein, it is necessary to break down some of the adjacent country rock, which is thereafter segregated from the vein material by sorting, and placed in a dump at the surface as waste material. The American Dump was composed of such waste material and ore which the operating lessee regarded as of too-low grade to be profitably treated.

The American shaft through which all ore or waste material was hoisted was located near the southwesterly corner of the American. The surface of the ground which descended rather abruptly to the south from the American shaft did not readily permit the placing of this waste material in any substantial amount upon the surface of the American. The compromise settlement granted to the owners of the American, and the Amer Company, as lessee of that claim, "the rights to dump mining waste, without stint, on and over the surface of the said Fraction Lode, both for the operations under the terms of this Agreement and for any future operation of the American lode." The greater portion of the American Dump was located on the Fraction claim. A small portion thereof was located on the Huron claim. The latter claim was not covered by the agreement, but the parties treated it as embraced within the provision respecting the Fraction.

In addition to the waste material, material of too-low grade to be shipped to the smelter for treatment was placed in what was known as the mill ore dump located between two waste dumps in a little gulley that had been made by the formation of those two dumps. Substantially all that portion of the mill ore dump which could be moved and treated profitably was removed by the American lessee in 1934 and 1935, and the remainder became a portion of the waste dump. Occasionally, the American lessee had men go over the waste dump and pick out chunks of ore that had been placed inadvertently in the dump. The American Dump was created by materials removed by the operating lessees of the American between 1930 and May, 1940. Very little material was placed in the dump after October 1, 1939.

Buena V. Ellis and Ida McGowan were not parties to the leases of the American granted to William A. Ellis, or the Amer Company. Nor were they parties to the compromise agreement or the supplement thereto. About 1936, they instituted their respective suits in the district court of Park County, Colorado, against Amer Company and W. A. Ellis, Inc., lessees of the American, the London, and the other owners of the Huron, Fraction, and Ibex claims. In those suits they respectively alleged that Buena V. Ellis was the owner of an undivided $\frac{4}{48}$ interest in the American, and that Ida McGowan was the owner of a $\frac{2}{48}$ interest in the American; that the apex of the vein extended from end line to end line of the American; that the defendants had extracted valuable ores from such vein to which they were respectively entitled in proportion to their undivided interests in the claim. On December 10, 1939, the court entered its judgments in those actions. It found and adjudged that the apex of the vein in controversy entered the south end line of the American, but departed therefrom $51\frac{1}{2}$ feet from such end line and thence in its course northward extended throughout the Fraction claim, and that only $51\frac{1}{2}$ feet were appurtenant to the American. The court adjudged that Buena V. Ellis was the owner of an undivided $\frac{4}{48}$ interest and Ida McGowan an undivided $\frac{2}{48}$ interest in the American. It awarded judgment against the defendants in the actions to Buena V. Ellis for $20,000, and Ida McGowan for $10,000. Thereafter, these judgments were fully satisfied.

On December 15, 1939, Buena V. Ellis, by her guardian, executed and delivered a release to the owners of the American, except Ida McGowan, and their lessees, whereby she acknowledged satisfaction of her judgment and released and discharged the owners of the American, other than Ida McGowan, and their lessees, "of and from all claims, demands, damages, actions, causes of action, or suits at law or in equity of whatsoever kind or nature" which she might have against such owners and lessees up to the date of the release "whether involved" in the action brought by her "or otherwise." On November 1, 1939, Ida McGowan executed and delivered a like satisfaction, release, and discharge to the owners of the American, except Buena V. Ellis, and their lessees.

No material placed in the American Dump was taken from the south 51½ feet of the claim after October 1, 1939. Only 725 tons of material in the waste dump came from the south 51½ feet of the American vein.

Prior to the granting by the American owners of the leases on that claim in 1930 and 1931, there had never been a successful mill operation in the Alma District. The Record Mill Company, a subsidiary of the Amer Company, constructed the Record Mill located 4600 feet easterly from the American shaft. This mill was utilized by the Amer Company and W. A. Ellis, Inc., in treating ores until 1937. London purchased the mill from Record in 1937 and a few months thereafter purchased the tram connecting the mill with the American mine and substantially all of the equipment that had been used in milling operations. London originally intended to remove the mill to another part of Colorado to mill a tailings dump, but shortly after it purchased the mill, it acquired the right to operate what was known as the South London Dump, located about 1600 feet west of the American shaft. It completed the milling of the South London Dump in December, 1939. In the summer of that year, London gave consideration to treatment of the American Dump. In order to determine whether the American Dump could be operated at a profit, London sampled the surface of the dump in the summer of 1939, and reached the conclusion that 20,000 tons of ore could be sorted out of the dump, which would have a gross value of about $5.70 a ton. London conferred with Orison Ellis with respect to the treatment of the American Dump but reached no agreement with him. As a result of negotiations between London and W. A. Ellis, Inc., the latter executed and delivered to London on June 7, 1940, an assignment transferring and assigning to London all the right, title, and interest of W. A. Ellis, Inc., under the leases on the American, which had been assigned to it, except under the lease from London, and cancelling and surrendering the latter lease, a quitclaim deed transferring to London all the right, title, and interest of W. A. Ellis, Inc., in and to the American Dump, and a bill of sale transferring to London all of the right, title, and interest of W. A. Ellis, Inc., in certain specified equipment and machinery situated upon the American Dump.

Under date of June 21, 1940, an agreement was made between London and the London Mines and Milling Company, its coowner in the Huron and Fraction claims, whereby the latter quitclaimed to London all of its right, title, and interest in and to the American Dump.

On or about June 12, 1940, London started its operations on the dump and prior to August 20, 1940, the date of the expiration of the leases of the American assigned to London, it or its wholly-owned subsidiary, the Chicago Company, to which it had executed an agreement of sublease on June 10, 1940, had removed all of the material from its original location in the dump, and had washed and stored it preparatory to milling it through the Record Mill. Prior to August 20, 1940, a large portion had already gone through the mill, approximately 9,000 tons had been trammed, and 4,000 tons were located adjacent to the mill and had already been sorted and screened and put in stock piles ready for milling on the Huron claim.

The material in the dump amounted to 65,000 tons gross, of which approximately 22,000 tons were milled. The remainder was regarded as worthless. The recovery from the dump averaged about $7 per ton. London made a net profit from the operation of $72,917.58. London tendered to the plaintiffs approximately $7,300 as royalty. The tender was rejected.

In their answer, London, the Chicago Company, and the individual defendants, set up that the dump had been abandoned by the plaintiffs and its lessees; that title to the dump was vested in London; that Buena V. Ellis and Ida McGowan had released any

410

claim they had to the dump, and that in any event the liability of defendants was limited to the royalties prescribed in the leases.

Section 8, Ch. 92, Colo.Stat.Ann.1935, provides: "Whenever two or more persons own any mine they shall be considered tenants in common and any one or more such tenants in common shall have the right to enter upon, occupy, prospect, develop and work said mine in a miner-like manner, extracting, milling and disposing of the ore from the common property without the consent of any non-working tenant in common, subject to accounting to the non-working tenant in common for his proportionate share of the net profits of such mining operations."

The trial court held that because of the foregoing statute, London could not "strengthen its position" or "relieve itself from the obligations" imposed by the "statute," by acquiring the rights of W. A. Ellis, Inc., as successor-lessee, that London's acquisition of the leases resulted in the merger of its interests as owner and lessee, and that London was obligated to account to the plaintiffs as a coowner. It awarded judgment against the defendants for the aggregate amount of $36,458.79, one-half of the net profits realized by London and the Chicago Company, and apportioned the recovery among the several plaintiffs in accordance with a stipulation entered into between the plaintiffs.

When tailings are permitted to pass by stream or seepage on to another tract, they become an accretion to the latter and belong to the owner thereof.[5]

Ordinarily, mineral-bearing ore removed from a mine and dumped or retained on the leased premises is the property of the operating lessee, subject to the royalty rights of the lessor.[6]

In the absence of an express or implied agreement to the contrary, material removed from a mine and dumped or placed on land of another will be regarded as appurtenant to the land on which it is dumped,[7] but the owner of the land on which it is dumped and the owner of the dump may agree that it shall be regarded as personalty.[8] Here, the compromise agreement gave the lessees of the American the right to dump the waste material on the Fraction and Huron claims. It was silent with respect to the ownership of the dump after it had been placed on the Fraction and Huron claims. But the grant of the right to dump and the other provisions of the contract, all considered together, indicated an intent and understanding that title to the dump should not pass to the owners of the Fraction and Huron claims. For nearly ten years the operating lessee of the American removed ore from the dump, processed it, sold it, and paid royalty thereon, all without any complaint from the owners of the Fraction and Huron claims. Thus, the parties clearly interpreted their contract to mean that the dump should be treated as personalty belonging to the operating lessee of the American, subject to the royalty interest of the lessors and not to the owners or operating lessees of the Fraction and Huron claims.[9] That interpretation does no violence to the language of the compromise agreement and should be, accepted here as the intended meaning thereof.

The title to minerals in place remains in the lessor.[10] Mining leases confer upon the lessee the exclusive possession of the deposits and the right to remove and reduce the ore to ownership.[11] And, when the lessee severs the minerals and removes them from the mine, they become the personal property of the lessee, subject to his obligation to pay royalty, where the lease

[5] Stephen Hays Estate v. Togliatti, 85 Utah 137, 38 P.2d 1066, 1068; Lindley on Mines, 3d Ed., p. 1009, § 426.

[6] Morrison on Mining Rights, 16th Ed., p. 245.

[7] Manson v. Dayton, 8 Cir., 153 F. 258, 263; Eggborn v. Smith, 114 Va. 745, 77 S.E. 593, 598, Ann.Cas.1914C, 1148; 50 C.J., p. 769.

[8] Manson v. Dayton, supra, 153 F. at page 263.

[9] Where the language of a contract is ambiguous, the practical construction which the parties have placed upon it is entitled to great weight in determining its proper interpretation. Lawrence National Bank v. Rice, 10 Cir., 82 F.2d 28, 33; Lowrey v. Territory of Hawaii, 206 U.S. 206, 222, 27 S.Ct. 622, 51 L.Ed. 1026; Commercial Standard Ins. Co. v. Remer, 10 Cir., 119 F.2d 66, 70; Cohen v. Clayton Coal Co., 86 Colo. 270, 281 P. 111, 113, 74 A.L.R. 467.

[10] Lynch v. Alworth-Stephens Co., 267 U.S. 364, 369, 45 S.Ct. 274, 69 L.Ed. 660; United States v. Biwabik Min. Co., 247 U.S. 116, 123, 38 S.Ct. 462, 62 L.Ed. 1017.

[11] Lynch v. Alworth-Stephens Co., 267 U.S. 364, 369, 45 S.Ct. 274, 69 L.Ed. 660; Ewert v. Robinson, 8 Cir., 289 F. 740, 746, 747.

does not provide for the payment of royalty in kind.[12]

■■ The quoted provision in the lease from Orison Ellis to Wm. A. Ellis, Jr., and the like provision in the remaining leases given to Wm. A. Ellis, Jr., and Amer Company did not have the effect of retaining title to the severed ore in the lessors. The obvious purpose of that provision was to prevent the lessee, after discovery of ore on the leased premises, from locating or otherwise acquiring an adjoining claim and thereby acquiring extralateral rights to a vein or lode in the leased premises adversely to the lessors.

■ It follows that title to the American Dump was in the lessees of the American and their successors, subject to the obligation to pay royalty.

■ The several operating lessees of the American during the period of their operations had from time to time removed ore from the dump. The acquisition by London of the interests in the dump of W. A. Ellis, Inc., through assignment of the leases, and the quitclaim deed from W. A. Ellis, Inc., was a recognition by London that W. A. Ellis, Inc., as successor-lessee, continued to claim an interest in, and had not abandoned the dump. Furthermore, London took the leases and the title of W. A. Ellis, Inc., to the dump for the express purpose of removing the mineral content from the minerals in the dump, and necessarily took such benefits as flowed from the assignment of the leases and the quitclaim deed, burdened with the obligation to pay royalties to the lessors.

■ Did the relation of coowner between London and the plaintiffs in the American prevent London from acquiring as against its coowners the rights of W. A. Ellis, Inc., under the leases and the title of W. A. Ellis, Inc., to the material in the dump? It is well settled that one of two or more tenants in common cannot purchase an outstanding title or incumbrance upon the joint estate for his own benefit.[13] But here, London acquired no title antagonistic or hostile to the plaintiffs. Whatever might have been the effect of the negotiations with Orison Ellis, had they been consummated, becomes immaterial, because they completely failed of consummation and were abandoned. The rights of W. A. Ellis, Inc., as successor-lessee under the leases, and as owner of the severed materials in the dump, subject to the obligation to pay royalty, in no sense constituted an outstanding title antagonistic or hostile to the interests of the plaintiffs, other than Buena V. Ellis and Ida McGowan.[14] Those rights were acquired by leases executed by the plaintiffs, other than Buena V. Ellis and Ida McGowan, or their predecessors in interest, and such leaseholds and titles acquired thereunder were assignable. The acquisition by London of the leases and the rights of W. A. Ellis, Inc., in the dump in nowise tended to injure or damage the plaintiffs, other than Buena V. Ellis and Ida McGowan. Their rights to royalty and the performance of the other covenants of the leases remained undisturbed. Their rights were exactly the same after the acquisition by London as they were when the leasehold and the title to the dump were vested in W. A. Ellis, Inc. The transfers, instead of injuring the plaintiffs, other than Buena V. Ellis and Ida McGowan, were beneficial to them. London owned a mill and was able, ready, and willing to remove the material from the dump, extract the minerals therefrom, and pay royalties to the plaintiffs. It is extremely doubtful that W. A. Ellis, Inc., had it continued as operating lessee, would have made any recovery from the dump.

■ We accordingly conclude that the obligation of London was not to account for the minerals extracted from the dump

[12] Eureka Development Co. v. Clements, 44 Idaho 484, 258 P. 371, 372; Brewer v. Forest Gravel Co., Inc., 172 La. 828, 135 So. 372, 373; Meeks v. Clear Jack Mining Co., 141 Mo.App. 648, 124 S.W. 1084, 1088; Baker v. Hart, 123 N.Y. 470, 25 N.E. 948, 12 L.R.A. 60; United States v. Stanolind Crude Oil Purchase Co., 10 Cir., 113 F.2d 194, 198; 40 C.J., p. 1013, § 615; 36 Am.Jur., p. 312, §§ 45, 46; Morrison on Mining Rights, 16th Ed., p. 287; Erwin's Appeal, 12 A. 149, 7 Sadler, Pa. 477, 16 M.R. 91.

[13] Bissell v. Foss, 114 U.S. 252, 259, 5 S.Ct. 851, 29 L.Ed. 126; Note, 54 A.L. R. 875.

[14] Bissell v. Foss, 114 U.S. 252, 259, 260, 5 S.Ct. 851, 29 L.Ed. 126; Fleming v. Casady, 202 Iowa 1094, 211 N.W. 488, 494; Ramberg v. Wahlstrom, 140 Ill. 182, 29 N.E. 727, 33 Am.St.Rep. 227; Frank v. Frank, 305 Ill. 181, 137 N.E. 151, 154; McLaughlin v. McLaughlin, 80 Md. 115, 30 A. 607, 608; 62 C.J., p. 460, § 81.

as a covenant, but only to pay royalty, as the operating lessee, to the plaintiffs, other than Buena V. Ellis and Ida McGowan.

Buena V. Ellis and Ida McGowan were not parties to the leases, nor to the compromise agreement. In the actions brought by them in the district court of Park County, Colorado, the court found and adjudged that the apex of the vein entered the south end line of the American but departed therefrom through the side line, 51½ feet from such end line and thence in its course northward extended throughout the Fraction claim, and that only 51½ feet of the vein was appurtenant to the American. This finding and judgment was in accordance with the settled rule that where the apex of a vein enters the end line of the claim and departs through a side line, the owner of that claim is entitled solely to that segment of the apex and rights pertaining thereto.[15] In such actions Buena V. Ellis and Ida McGowan sought to recover the value of ore removed from the American. The judgments in such actions were paid and satisfied. Buena V. Ellis executed a release dated December 15, 1939, of all claims, of whatsoever kind or nature, against the defendants in such actions up to December 15, 1939. Ida McGowan executed a similar release of claims up to November 1, 1939. They thereby released the operating lessees of the American and London as to all ore that had been removed and placed in the dump prior to the dates, respectively, of their releases. The undisputed evidence in the instant case is to the effect that no material from the 51½ feet of the vein in which Buena V. Ellis and Ida McGowan had an undivided interest was removed and placed in the American Dump after October 1, 1939. It follows that any claims of Buena V. Ellis and Ida McGowan for ores converted by the operating lessees and placed in the American Dump were discharged.

However, the defendants made a tender to the plaintiffs of $7,300 as royalty under the leases assigned to London, on the basis of 20% of one-half of the net smelter returns from the material removed from the dump and processed. The tender was an admission of liability on that basis.[16]

The compromise agreement provided that the ore in blocks A and B should be deemed and considered as belonging one-half to the Ellis group (except Buena V. Ellis and Ida McGowan, not parties to the agreement), and one-half to London. The supplemental agreement in effect treated block C as in the same ownership. It follows that Orison Ellis, Ellen W. Ellis, and Buena V. Ellis, as successor of Aline Ellis, are entitled to royalty on the basis of 20% of one-half of the net smelter returns from the material taken from the dump and processed.

Under a stipulation entered into by the plaintiffs the amount recovered in the action is to be divided on the basis of ½ to Buena V. Ellis, 5⁄24ths to Ellen W. Ellis, 5⁄24ths to Orison Ellis, and 1⁄12th to Ida McGowan.

The judgment is reversed and the cause remanded, with instructions to enter judgment against London and the Chicago Company for 20 per cent of the net smelter returns, as defined in the lease agreements, on one-half of the material removed from the American dump, and to apportion the recovery among the plaintiffs in accordance with their stipulation.

[15] Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co., 171 U.S. 55, 18 S.Ct. 895, 43 L.Ed. 72; 40 C.J., p. 822, § 249.

[16] Denver, S. P. & P. R. Co. v. Harp, 6 Colo. 420, 424.