LYMAN A. VAUGHN *vs.* RHODE ISLAND MORTGAGE & TRUST COMPANY.

PROVIDENCE—JULY 29, 1902.

PRESENT : Stiness, C. J., Tillinghast and Rogers, JJ.

(1) *Equity. Collateral Security. Pledge. Common Fund.*

A. purchased from B. notes of the T. Co. which contained a stipulation that certain tax-sale certificates were deposited with B. as collateral security for the payment thereof; the notes were defaulted when due. It appeared that B., instead of keeping the tax-sale certificates, which were collateral for A.'s notes, separate and apart, had mingled them, with other tax-sale certificates given by the maker as collateral security for other notes held by different parties, in what was called a common fund. Certificates from this common fund were from time to time sent by B. to the T. Co. to be redeemed, the proceeds to be transmitted to B., with the result that a considerable sum was lost, as the T. Co. transmitted by worthless checks which were never made good. A. denied all knowledge of the common fund, and that he consented to the mingling

of his collateral with the collateral of other purchasers of notes, as was claimed by B.  On a bill by A. for an accounting and for other relief :—

*Held*, affirming *Browne* v. *R. I. Mortgage & Trust Co.*, 21 R. I. 169, that the note called for the deposit of special certificates as security therefor, and that the burden of proof was upon B. to show that A. consented to the inclusion of his certificates in the common fund.

*Held*, further, that, as B. had admitted the mingling of the security in the common fund, no proof of demand by A. upon B. for the collateral security, nor a request to B. to sell the same and a refusal by B. to comply with such request, was necessary as a condition precedent to the maintaining of the suit.

*Held*, further, that A. was entitled to the relief sought.

BILL IN EQUITY, seeking an accounting and other relief. Heard on bill, answer, and proof.

ROGERS, J.  This is a suit in equity for an accounting and for other relief growing out of dealings in Kansas tax-sale certificates, and comes before us on bill, answer, and proofs.

On or about April 1, 1895, the complainant purchased of the respondent corporation four negotiable promissory notes made by the Topeka Commercial Security Company, all of the same tenor except as to the numbers and amounts thereof, etc., as hereinafter indicated.  One of said notes was as follow, viz. :

"$500.                                                      Number 41.
"TOPEKA, Kansas, Due Feb. 4, 1896.
"Feb. 1, 1895      $517.50
"8/4/95.   $17.50

" One year after date we promise to pay to the order of the Rhode Island Mortgage & Trust Company Five Hundred Dollars at the office of the Rhode Island Mortgage & Trust Co., Providence, R. I., value received, with seven per cent. interest, payable semi-annually from date until paid.

" And we hereby deposit or pledge as collateral security for the payment of this note, certain tax-sale certificates, deposited with Rhode Island Mortgage & Trust Company, and amounting principal and accrued interest to Five Hundred and Fifty Dollars.  And we hereby give to the holder thereof full power and authority to sell or collect at our expense all

or any portion thereof at any place either in Topeka or elsewhere, at public or private sale, at their option, on the nonperformance of the above promise, and at any time thereafter, and without advertising the same or otherwise giving to us any notice. In case of public sale, the holder may purchase without being liable to account for more than the net proceeds of such sale.

"The Topeka Commercial Security Co.

"*R. M. Gage, Secy. & Cash.*"

The other three notes were exactly like the one, a copy whereof is given above, save that those were each for $1,000, and were respectively numbered 44, 45 and 46. Six months' interest, or $17.50 on the $500 note, and $35 each on the $1,000 notes, was endorsed as having been paid.

All of the above described notes were endorsed to the complainant's order without recourse, by the respondent, and thus endorsed were transferred by delivery to the complainant.

The proof satisfies us that at the time of the purchase of said notes the treasurer of the respondent corporation stated to the complainant that tax-sale certificates had been deposited with said trust company as collateral security for the payment of said notes to the amount of the principal thereof and ten per cent. in addition, and that he could have said certificates, but as a general thing purchasers of those notes left the collateral security with the company, and that at the suggestion of the respondent and as a matter of convenience the complainant allowed said collateral security to remain with said respondent. It also appeared in proof that some purchasers of similar notes from the respondent, upon such purchases took into their own actual possession the tax-sale certificates pledged as collateral securities for such purchased notes.

(1)    As said by this court in *Wm. H. Browne* v. *The Rhode Island Mortgage & Trust Co.*, 21 R. I. 169, which was a suit upon notes precisely like those involved in the present suit, "We think that the clause in the complainant's notes called for the deposit and pledge of specific tax sale certificates for

each of the notes, which, or the proceeds of which, were required to be set apart and held for the payment of such note and that the respondent, when it undertook to take charge of these securities, was bound to keep them separate and apart from all securities for other notes, unless it had the consent of the complainant and of the holders of other notes to mingle them in a common fund."

The respondent admits that instead of keeping the tax sale certificates given by the maker of the notes so purchased by the complainant as collateral security therefor, separate and apart, it mingled them with numerous other tax-sale certificates given by the maker of said notes as collateral security for numerous other notes held by different parties, so that it was impossible for the respondent to sort out and determine which certificates were furnished as collateral for the notes held by the purchasers of similar notes, the collateral for which had been allowed to remain in the hands of the respondent, and which collateral, and the proceeds thereof it terms *a common fund.*

The respondent claims that the complainant had knowledge of *the common fund*, so-called, and consented to the mingling of his collateral security with the collateral of other purchasers of notes with tax-sale certificates as collateral.

There is much conflict in the evidence upon this point, the complainant swearing in the most positive and explicit manner that he not only never consented to having his securities go into a common fund, but that he never even heard of *a common fund* in connection therewith, until long after the notes became due and remained unpaid.

In this conflict of testimony it is necessary, to be able to properly weigh the evidence, to understand what *the common fund* exactly was, and what manner of treatment, in the respondent's understanding, as shown by its treatment of it, it authorized the respondent to exercise.

It appears from the testimony that prior to the sale of said notes to the complainant, the respondent had been dealing in notes made by the said Topeka Commercial Security Company, secured by Kansas tax-sale certificates. The re-

23

spective notes were secured by tax-sale certificates to an amount ten per cent. larger than the face value of the note. These certificates were of various amounts from a few dollars up to $150, varying in that respect as the taxes on the land or estates to which they applied varied.    When a Kansas tax payer was in default a certain length of time in the payment of the taxes upon his landed estate, such estate, or sufficient thereof to pay the tax was sold for the payment thereof, and a tax-sale certificate was given to the purchaser. If within a certain prescribed period (three years, we understand) the tax payer paid the tax, together with interest at a prescribed rate (which was very high) then the holder was obliged to accept the money and surrender up the tax-sale certificate.    If, however, the amount of the tax and interest was not paid within the prescribed period, then the holder of the tax-sale certificate was entitled (if he had kept the taxes paid up meanwhile) to an absolute deed of the property.  These tax-sale certificates applied to different pieces of property, and hence the notes secured thereby made by the Topeka Commercial Security Company for different amounts and bearing different dates, bore no more relation to one another, as far as the holders thereof were concerned, than that they were made by the same maker—that is to say, by way of illustration, that the security of these notes was not the same relatively as is that of a series of a railroad company's bonds which are secured by a mortgage on identically the same property and which are to be paid in whole, or if default be made then *pro rata*, out of the same security.    The tax-sale certificates held by the various purchasers of the Topeka Commercial Security Company's notes did not, therefore, afford the same security to the holders thereof, for they varied as much as liens, whether by mortgage or otherwise, on different pieces of land, would vary, and of course tax-sale certificates on fertile or valuable land might be worth more than those on less fertile land, and these tax-sale certificates were not confined to the same town, nor county, nor even to the same section of the State necessarily.    So tax-sale certificates on the lands of tax payers, who would redeem their lands, would be worth

more, at least for security, than those on lands of tax payers who would not redeem them.

The origination of the idea of *a common fund,* as it is called, seems to have been in a letter from R. M. Gage, the secretary of the Topeka Commercial Security Company, to the respondent, dated April 9, 1894. "I note what you say," runs the letter, "about various parties returning collateral to you and also what you say about splitting up the collateral, etc. It seems to me the subject is now sufficiently introduced so we could afford to stand pat on a proposition to keep the collateral to notes of less than $10,000 in a common fund, and I really don't see the advantage to the lender in separating the collateral at all, for I do not believe there is any choice in the collateral we sent you, all of which we regard as strictly gilt edge and safe beyond question. At the same time the terms of their notes would enable them to call upon you for a specific amount of this collateral at any time default were made, so that it seems to me their advantage would really lie in the direction of having it all in a common fund, while beyond doubt it would relieve you and ourselves of a good deal of labor. I have been so anxious to get this matter properly introduced to you and your people that I have been very willing and am still very willing to do any reasonable amount of work and even to ask you for the time being to share with us this extra labor, but I shall of course be glad when the simpler methods are practicable. If we had it all in one fund, or even in $10,000 blocks, after the certificates were once entered up the expenditure of *nerve force* would be very light indeed and would be more than compensated for by the feeling of absolute security in a profitable investment."

Notwithstanding the contents of the above referred to letter no change was made in the form or manner of issuing the notes or the agreement in regard to the collateral, so far at least as a formal or distinct proposition to or agreement by the beneficial holders thereof evidenced by any written or printed paper was concerned.

The evidence shows that the respondent, from time to time, permitted the Topeka Commercial Security Co., without the

knowledge or consent of the complainant, to receive the money from the redemption of said tax-sale certificates, and to substitute other certificates in the place of those redeemed.

The evidence also shows that the respondent for some time after it came into possession of said tax sale certificates was accustomed to send such of them as, and when, they were called for to be redeemed, to the Merchants National Bank of Topeka, Kansas, which received the money paid for the redemption of said security, and paid it to the respondent company. This seems to have been done at the suggestion,. in part at least, of a letter from said Topeka Commercial Security Company of March 27, 1894, as follows: "Now, if the holders of these certificates desire they can send them to the county treasurer of the various counties in addressed envelopes which we will send them, but it occurs to me that it would be more convenient for them if the certificates were sent in a lump to the Merchants National Bank, assuming of course that they would not think it good banking to send them directly to us as they are collateral to our own notes." Subsequently, however, the respondent began to send the tax-sale certificates which were to be redeemed directly to said Topeka Commercial Security Company instead of the Merchants National Bank of Topeka, and permitted it to receive the money paid for the redemption of said collateral and transmit it to the respondent company, with the result that a considerable sum was lost inasmuch as the Topeka Commercial Security Company transmitted by worthless checks which have never been made good.

There are other peculiarities of *the common fund* which are alleged to exist but which we do not refer to as not having been so satisfactorily proved as those already referred to.

Such was *the common fund* which the respondent claims the complainant had knowledge of the existence of and consented to have his securities managed and administered in.

We think it might well go without saying, that to justify the respondent in including the securities of the complainant in a common fund thus composed and administered, would require clear and convincing evidence of knowledge and con-

sent to such treatment, especially when the complainant swears emphatically and explicitly that he never consented to any such arrangement, and never even heard of a common fund of any description in connection with his securities. It is a matter of surprise that the respondent should be willing to so manage securities entrusted to its keeping without a distinct written authority thereto.

This claim is sought to be supported not by any indisputable written evidence, not even by oral evidence to any collective body of note holders in any *quasi* public or formal manner, but only by testimony of Messrs. Mason, Jillson and Carpenter, who were the president, treasurer and bookkeeper, respectively of the respondent company, to alleged casual conversations with individual note holders from time to time, and in this case with the complainant. The complainant swears that he remembers no such conversations, when, it seems to us, with his interest, unless he is committing wilful perjury, he could not fail to remember them and therefore could not so swear ; and he swears emphatically that he did not have such knowledge and never gave such consent. The said officials of the respondent company swear with varying degrees of positiveness and detail. The three officials referred to evidently sympathize with the respondent, as is perhaps only natural, and under all the circumstances of this case and taking into consideration the character of their evidence it is easier for us to believe that they are mistaken either in the matter sworn to, or in the identity of the person to whom it is applied, than it is for us to believe that the complainant in his testimony committed wilful perjury. The burden of proof is upon the respondent to make out the defence it relies upon, and we are far from being satisfied, by a preponderance of evidence that commands our confidence, that the complainant had knowledge of the existence of a common fund, so called, until long after the default in the payment of said notes, or that he ever consented to the inclusion of his security in such common fund.

The respondent contends that the complainant never demanded from it the collateral security belonging to him as the

holder of the notes, which had been left with the respondent, nor had ever requested the respondent to sell the collateral, and that it was necessary for the complainant to have made one or the other or both of such requests and to have shown that the respondent refused such requests, as a condition precedent to the maintenance of this suit. Granting that no such demands were ever made, we fail to see any necessity in this case for them. A formal demand is necessary in some actions under some circumstances; thus, in an action by the holder of a promissory note against an endorser upon his endorsement a demand for payment upon the endorser after default by the maker is necessary, unless such demand has been waived; but in the case at bar, the respondent, although it happens to be the endorser upon said notes, yet it is without recourse to it as such endorser, and it is being sued, not upon any pretended liability as an endorser, but upon its liability for an alleged breach of trust as custodian of security entrusted to it. So in an action of trover, where a defendant came into possession of converted chattels by the plaintiff's own act, it is sometimes necessary to show a demand and refusal in order to prove the conversion, but if a conversion can be shown otherwise, proof of such demand and refusal is not necessary. In the case at bar the respondent has admitted its mingling the complainant's security with that of others in a common fund, so called, and long before this suit was brought the officers of the respondent company had sworn to such fact in another suit of similar character to this, viz.: in the suit of Wm. H. Browne against this respondent, so that such a demand would have been an empty form, a mere work of supererogation productive of no good in any manner whatever.

We do not think that the evidence shows that the complainant had knowledge even, much less that he assented, that the respondent had or might put the tax-sale certificates pledged as security for the notes held by him, into a common fund with others; neither do we think that, under the circumstances of this case, any demand was a necessary condition precedent to the bringing of this suit. We are, there-

fore, of the opinion that the defences to the bill fail, and that the complainant is entitled to the relief sought.

Decree accordingly.

*N. W. Littlefield*, for complainant.

*Dexter B. Potter and Cooke & Angell*, for respondent.