**PILGRIM v. GRANT et al.**

No. 3802.

District Court of Alaska. Fourth Division. Cordova.

Feb. 3, 1936.

18 

20

Julian A. Hurley, of Fairbanks, for plaintiff.

Charles E. Taylor, of Fairbanks, for defendant O. M. Grant.

Cecil H. Clegg, of Fairbanks, for defendants David and John Mutchler.

HELLENTHAL, District Judge.

Edna G. Pilgrim, the plaintiff, brought this action as a co-owner with the defendants O. M. Grant, George Mutchler, David Mutchler and John Mutchler, of the Irishman No. 1 Lode Claim, situate on the divide between Saint

Patricks Creek and Happy Creek in the Fairbanks Recording Precinct, Alaska; which lode claim will hereafter be referred to simply as the "Irishman."

In the amended complaint it is alleged that the defendant Grant commenced mining operations on the Irishman, independent of the plaintiff, on or about January 1st, 1930, and that the rest of the defendants joined Grant in working and mining said claim, and milling the ore taken therefrom on or about October 1st, 1932, and are continuing their mining operations on said claim.

That there is a vein on the Irishman running parallel with the side line at a place where the Irishman adjoins the Wasp Lode Mining Claim, which Wasp Lode Mining Claim will hereafter be referred to simply as the "Wasp"; that all of the operations carried on by the defendants were on this vein and all of the ore that was mined was taken from said vein; that this vein has its apex on the Wasp; that this was discovered by the defendants while they were mining on the Irishman as aforesaid, between October 1st, 1932, and June 6th, 1933; that the Wasp, on which the apex was found, was at the time owned by H. N. Macomb; that the title to the Wasp constituted an outstanding adverse title to said vein and the Irishman.

That the defendants, without informing plaintiff of the above stated facts, on July 6, 1933, purchased the Wasp for $300; that the Wasp was purchased by the defendants to protect their interest in the vein they had been mining on the Irishman, and to defraud the plaintiff; that upon the plaintiff learning the above facts she offered to pay the defendants one-half of the price paid for the Wasp, and demanded a deed to a half-interest, which the defendants refused to give.

Besides the foregoing, it is alleged in the second cause of action that the plaintiff is an equitable owner of a one-half interest in the Wasp; that the possession of the Irishman by the defendants was wrongful since the 24th day of September, 1932, and that the possession of the defendants

of the Wasp was wrongful since July 6, 1933, and that defendants have refused plaintiff the right to enter into the possession of the Wasp, or any part thereof and have denied her right to an interest in said Wasp; that the defendants have mined and milled a large amount of ore in the operation on said claims at a profit and have converted said profit to their own use, and have failed and refused to account to the plaintiff for the same.

The prayer is to have a trust declared as to the Wasp and that the defendants be required to deed a one-half interest therein to the plaintiff; that defendants account for the ore mined and that plaintiff have judgment for one-half of the value of the ore.

To this complaint the defendant Grant has filed a separate answer, and the defendants David and John Mutchler have filed an answer. The defendant George Mutchler was not served and does not appear.

Defendant Grant by his answer admits his ownership of an interest in the Irishman; denies the ownership of the other defendants; admits that he worked on the Irishman at intervals between January 1st, 1930, and October 1st, 1932; admits that he and his co-defendants commenced work on the Irishman, but denies that they are still working on said claim. He admits that on October 1st, 1932, H. N. Macomb owned the Wasp, but denies that defendants, in their operations, discovered that the apex of the vein they were working was on the Wasp; admits he did not inform plaintiff regarding the apex of the vein and alleges he does not know the location thereof; admits he and the other defendants purchased the Wasp, but denies that the same was purchased to protect the title of, and right to, the vein on the Irishman; and he especially denies that the Wasp was purchased secretly or with any intent to injure or defraud the plaintiff; admits that plaintiff offered to pay her part of the purchase price of the Wasp and that she demanded a deed to one-half interest and that he refused such payment and demand.

As his first affirmative defense to the first cause of action he alleges that on or about November 21, 1928, he and plaintiff's predecessor in interest staked the Irishman, and that thereafter during 1929 and 1930 he prospected and discovered a vein on said claim and attempted to work and mine the same, and as a result became thoroughly familiar with said vein or lode and with the nature and structure of the rock thereon, as well as the direction of the strike and dip of the vein; that said lode extends its entire length in a northeasterly and southwesterly direction, and dips in a northwesterly direction; that he agreed to sell his interest to his co-owner; that he and his co-owner could not work the claim at a profit; and that he ceased work on the Irishman about April 1, 1933, and has not worked thereon since.

That the Wasp, located by H. N. Macomb, is situate on the westerly side of the Irishman; that he entered into an agreement to prospect the Wasp with Macomb, and to lease it if he should desire; that pursuant to such agreement he went on the Wasp and prospected and developed said claim and ever since has been working the Wasp; that the vein or lode on the Wasp is located about 600 feet from the vein on the Irishman, and runs parallel thereto and has a different structure of rock and ore, and dips in an easterly direction; that the lode on the Wasp has no connection with the lode on the Irishman, and that the Wasp lode is not within the boundaries of the Irishman. That Macomb was an old sick man, desirous of leaving Alaska; that he and defendant, George Mutchler, purchased the Wasp and now own the same, subject to equities in the other defendants.

For answer to the second cause of action Grant further admits, denies and alleges: Denies that plaintiff is an equitable owner of the Wasp; admits that since July 6, 1933, defendants have mined and extracted valuable ore from the Wasp and that they have converted same to their own use; denies that the defendants have wrongfully assumed or exercised control of either or both the Irishman and the Wasp; denies that the defendants have made a profit from

ore mined on the Irishman; and avers that the plaintiff has no interest in the Wasp.

For affirmative defense to the second cause of action Grant alleges that he rendered plaintiff an account of work done on the Irishman which showed a loss to the defendant; that part of the work done on the Wasp was included in the statement, and avers that the same should not have been included.

For second affirmative defense to the second cause of action Grant alleges that the plaintiff leased her interest in the Irishman to C. E. Farrell and that Farrell assigned same to the defendants, and that defendants have not mined on the Irishman but on the Wasp, and will account for ore mined on the Irishman under the lease; that plaintiff has never been ousted from the Irishman; that Grant executed a lease to Farrell and to the other defendants of his one-half interest, and that said lessees are now in possession of the said mining claim and are working and operating the same.

David and John Mutchler in their answer deny that Grant commenced operations on the Irishman on or about January 1st, 1930; and deny that the defendants commenced work on the Irishman on or about October 1st, 1932; deny that they did not inform plaintiff regarding the apex of the lode on the Irishman; deny that Grant and George Mutchler purchased the Wasp; deny that the Wasp and the Irishman adjoin; deny that $300 was paid for the Wasp; deny that plaintiff offered to pay part of the purchase price of the Wasp; and deny that she demanded a deed to a half-interest; and deny that they refused to give plaintiff a deed, and deny that defendants and the plaintiff own the Irishman.

As a first affirmative defense to the first cause of action they admit that they are co-owners with the plaintiff and that they own a two-tenths interest in the Irishman, and allege that the plaintiff issued a lease to C. E. Farrell on January

20, 1934, which lease was to the Irishman; and that said lease has been assigned to the defendants.

As a second affirmative defense to the first cause of action they allege that there is no connection between the lode or vein on the Irishman and the lode or vein on the Wasp.

And as a third affirmative defense to the first cause of action they allege that the location of the apex of the vein or lode on which they are working has not been determined.

For answer to the second cause of action they admit that Grant and the plaintiff were the owners of the Irishman on December 18, 1929, and that on October 1st, 1932, H. N. Macomb owned the Wasp, and deny every other allegation contained in the second cause of action; and further make the same affirmative defenses to the second cause of action that they make to the first cause of action.

The plaintiff in her reply to the affirmative matter contained in Grant's answer denies the material allegations contained in the first affirmative answer to the first cause of action; and for reply to the first affirmative defense to the second cause of action she admits the giving of the account, but denies that it is a full account.

For reply to the second affirmative defense to the second cause of action she denies all the material allegations contained in said answer; and for reply to the third affirmative defense to the second cause of action she admits making the Farrell lease, but denies the effect and other material allegations contained in said answer; and for affirmative reply to the third affirmative defense to the second cause of action she alleges failure to comply by Farrell, and that the lease was forfeited and cancelled.

The plaintiff for reply to the Mutchler answer: First, denies the allegations as to ownership, contained in the answer to the first cause of action; and for reply to the first affirmative answer to the first cause of action she admits the execution of the Farrell lease; denies the effect thereof; and denies the other material allegations contained in said

answer; and for affirmative reply to the first affirmative answer to the first cause of action she alleges failure to comply by Farrell, and that the lease was forfeited and cancelled.

For reply to the second affirmative defense to the first cause of action she denies all the allegations therein contained; and for reply to the third affirmative defense of the first cause of action she denies all the allegations therein contained; and she makes similar reply to the defendants David and John Mutchler's answers to the second cause of action.

It is contended by the defendants O. M. Grant, David and John Mutchler that they are proceeded against jointly, not individually as tenants in common, and that since George Mutchler, one of the tenants in common, has not been served and has not voluntarily appeared, the controversy can not be satisfactorily adjusted, and that the case can not be tried without George Mutchler.

The Court is of the opinion that the defendants have been proceeded against individually; that the right of a tenant in common is a several right and not a joint right (62 C.J. p. 409, sec. 4) and that the only way a trust can be imposed upon property held by a tenant in common is by a proceeding against such tenant in common, in an individual capacity. This remedy is available to the plaintiff, a tenant in common, under the common law independent of statute. Turner v. Sawyer, 150 U.S. 578, 586, 14 S.Ct. 192, 195, 37 L.Ed. 1189, in which the Court holds: "A title thus acquired the patentee holds in trust for the true owner, and this court has repeatedly held that a bill in equity will lie to enforce such trust." See also 62 C.J. p. 492, sec. 136, and Mills v. Hart, 24 Colo. 505, 52 P. 680, 65 Am.St.Rep. 241.

The Court is of the opinion that the laws of Alaska, Section 3387, permit suit against one or more tenants in common, which are severally liable on the same ob-

ligation; that the matter in issue between the plaintiff and the answering defendants in the first cause of action can be fully determined, and that the plaintiff had the right to bring this cause of action against any one or more of the defendants; that the pleadings relating to the second cause of action show that the defendants, while owners in common of a part interest in the Irishman, mined the same under conditions that would make them mining partners; but since this cause of action is not brought for a liability of the partnership as such, and can be maintained only for a share of the profits made or received by each of the partners as tenants in common with the plaintiff, under Sec. 2866; and since under Sections 2743 and 2742, partners are jointly and severally liable where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it, we are of the opinion that the second cause of action for an accounting can properly be maintained against each of the defendants severally; and that under Section 3387 it was the privilege of the plaintiff to proceed against or serve as many of the tenants in common as she saw fit; that it is not necessary for the plaintiff to allege or prove either an ouster or exclusion in order to maintain her right under Section 2866 to have an accounting for profits made. Lindley on Mines, 3d Ed., p. 1948.

However, the pleadings admit that the plaintiff has been excluded from the Wasp, and that defendants deny her right to the Wasp. In any event the claim that the operations were not on the Irishman but on the Wasp would be sufficient to authorize the bringing of this action.

We are further of the opinion that the matters in issue in the second cause of action can be completely determined as far as the interests of the defendants who are before the Court are concerned, and for that reason the Court is of the opinion that the objection is not well taken.

It is contended by the defendants David and John Mutchler that no demand was made by the plaintiff on them for

an interest in the Wasp Claim, and that no offer to contribute was made by plaintiff, and that for that reason the plaintiff should not be allowed to maintain her action against the said David and John Mutchler. We are of the opinion that the said defendants are right in their contention that no express demand or offer to contribute was ever made by the plaintiff on or to them, as shown by the testimony.

We are further of the opinion that a demand in a · civil case need not be direct, but may be implied; that the commencement of an action is in itself a demand and that where the evidence and pleadings show that a demand would be of no avail a demand need not be made.

Koyer v. Willmon, 150 Cal. 785, 90 P. 135, holds: "Where defendant purchased a lot in controversy in his own name, in violation of an agreement to purchase as the property of a firm, of which plaintiff and defendant were members, and refused to recognize plaintiff's interest in the property, plaintiff was not bound to make a formal tender of one-half of the purchase price as a condition precedent to his right to enforce a trust in the property."

Where a tenant in common purchases an outstanding title and had the same conveyed to his wife, who paid nothing therefor, failure of the cotenants in a suit to enforce a constructive trust of such interest, to allege a demand on the wife was material only as bearing on the matter of costs as against her. Coburn v. Page, 105 Me. 458, 74 A. 1026, 134 Am.St.Rep. 575.

Attorney acquiring title to land by breach of trust with intention of depriving his client thereof not entitled to reimbursement as a condition of the transfer of such title to his client. Home Investment Co. v. Strange, Tex.Civ.App., 152 S.W. 510, 109 Tex. 342, judgment reversed, 195 S.W. 849, reformed, 109 Tex. 342, 204 S.W. 314, which was again reformed, 109 Tex. 342, 207 S.W. 307.

Demand is not necessary as a condition precedent to an action to declare an alleged trust in the proceeds of the

sale of real estate for an accounting and for damages for the conversion of such proceeds by the trustee. Garard v. Garard, 135 Ind. 15, 34 N.E. 442, 809.

A cestui que trust who is entitled to possession need not demand such possession before bringing an action of ejectment against the trustee. Caldwell v. Lowden, 3 Brewst, Pa., 63.

Vaughn v. Rhode Island Mortgage & Trust Co., 24 R.I. 350, 53 A. 125, holds: "As a condition to bringing suit for breach of trust, as custodian of securities, it is not necessary to demand the securities of the trustee; it having admitted the mingling thereof with others, so that demand would be futile."

Wood v. White, 123 Me. 139, 122 A. 177 holds: "Where defendant fraudulently repudiated an agreement to hold land in trust for the joint benefit of himself and plaintiff as a business venture, plaintiff, who had paid only part of his share of the consideration, was under no obligation to tender payment of the balance before bringing suit to impress a trust."

Cunningham v. Long, 186 N.C. 526, 120 S.E. 81, holds: "In suit to declare a parol trust in land, where it was shown that on receipt of plaintiff's offer to repay the purchase price and interest it would have been declined, a formal tender of the purchase money was unnecessary."

An agent who in violation of agreement with corporation, principal, to purchase and improve for principal, land at his own expense, and accepts shares of capital stock as consideration, takes title in his own name, and asserts himself to be sole owner, holds such real estate in trust and is bound to convey to cestui que trust at any time on its demand, and such cestui que trust may so demand and maintain suit to declare and enforce such trust without first tendering stock to such trustee. Powell v. United Mining & Milling Co., 107 Okl. 170, 231 P. 307.

In Daniel v. Daniel, 106 Wash. 659, 181 P. 215, 222, the Court holds: "In this case we think the court rightly decreed an accounting. The property was productive at the time the plaintiff's interest was acquired. It has been withheld from her under an adverse claim. At no time would a demand for her share of the income have availed her anything, and, furthermore, the tenant in possession occupied towards her a fiduciary relation."

1 C. J. p. 627: 1 C.J.S., Accounting, § 28.

"Sec. 80 (D) Demand. A demand upon the party liable to account is generally a prerequisite to the right to maintain a bill for an accounting.

"Where the account is complicated, giving rise to an independent equity, it has been held that a preliminary personal demand for an accounting before resorting to equity is not necessary.

"Where an accounting is ancillary only to the main purposes of an action or suit no demand, it seems, is necessary."

65 C.J. p. 1020: "Sec. 949.(D) Demand. Ordinarily, before a cestui que trust may sue in equity to enforce his rights under the trust he must first have moved the trustee to act, and failed to secure such action. However, a demand is not necessary as a condition precedent to a suit against a trustee where a conversion by him is alleged or a demand would be of no avail; and in some cases a want of demand is held to be of importance only as bearing on the question of costs."

The plaintiff in her complaint alleges that she made a demand for a half interest in the Wasp Lode Claim, and offered to pay one half of the purchase price of the same, which demand and offer she alleges was refused. The evidence shows that said demand and offer were made by the plaintiff to the defendant O. M. Grant, and that said Grant refused her offer and demand. The evidence also shows that an account was made of part of the gold extracted from the Irishman; that this account includ-

ed moneys realized from the operations carried on by the defendants David and John Mutchler, and that afterwards the defendant Grant claimed that these operations should not have been included in the account. From the circumstances surrounding the offer and demand, it can readily be inferred that the defendants David and John Mutchler had knowledge of the demand made by the plaintiff, and the refusal of the defendant Grant to comply with said demand.

Considering all these circumstances, the court is of the opinion that it is justified in finding that if a demand had been made of the said defendants, and offer to contribute to said defendants, said demand and offer would have been refused. For the reasons above stated, the contentions made by the defendants David and John Mutchler should be denied.

It is also claimed by the defendants that the court should not have received testimony as to the location of the boundary line between the Irishman and the Wasp; and it is contended that there is another action pending to determine the same, although there has been no proof submitted that such action is pending.

The defendants claim that no ouster has been plead and that the proof does not show an ouster; that the possession of the defendants, being co-owners with the plaintiff, is the possession of the plaintiff, and that there can be no ouster. The court is of the opinion that there is much merit in the contention that the possession of the defendants is the possession of the plaintiff, and that therefore there can be no ouster, and consequently no action at law in ejectment, because an ouster is one of the indispensable requisites of an action in ejectment. This being so, the only remedy that the plaintiff has to determine said boundaries is an action in equity. If such an action is pending, it should have been consolidated and tried with the present action.

There can be no trust declared, based upon the contention that the lode is underneath the Irishman and the

apex is on the Wasp, unless the court determines the boundary line between said claims. Likewise, there can be no accounting of ore taken from the Irishman unless the extent of the claim—it being claimed by the defendants that the ore was taken from the Wasp and by the plaintiff that the ore was taken from the Irishman—is determined. The outcome, therefore, on both causes of action depends to a large extent upon the location of the common boundary. This being the case, it is absolutely essential to establish said boundary in order to determine the issues raised. For this reason the court is of the opinion that equity having acquired jurisdiction will determine all issues raised, in order to give complete relief.

1 Enc. of Law & Proc. p. 418, Accounts & Accounting: "(II) Retaining Cause for Complete Relief.—Another general principle to be hereafter more particularly applied, closely connected with the last preceding section, may be here stated, namely, when a court of equity once acquires jurisdiction upon equitable grounds it will proceed to do complete justice and administer full relief. To this end it will order an accounting and will settle the whole controversy, even to the extent of adjudicating matters of purely legal cognizance. And on the other hand where defendant is called on to account in a proper case, the court having obtained jurisdiction for this purpose, will take cognizance of the whole matter involved and necessary incidental relief will be granted."

Volume 1, Pomeroy's Equity Jurisprudence, p. 329: "Sec. 231. As Applied to the Concurrent Jurisdiction.— The rule has already been stated as one of the foundations of the concurrent jurisdiction that where a court of equity has obtained jurisdiction over some portion or feature of the controversy, it may and will in general, proceed to decide the whole issues and to award complete relief, although the rights of the parties are strictly legal, and the final remedy granted is of the kind which might be conferred by a court of law."

Volume 1, Pomeroy's Eq. Jur. p. 352: "Sec. 242. We have seen in the foregoing paragraphs that this conception of the equity jurisprudence has been steadily applied throughout the whole history of the court to a great variety of circumstances, litigations, and reliefs. By virtue of its operation and in order to promote justice the court having obtained jurisdiction of a controversy for some purpose clearly equitable, has often extended its judicial cognizance over rights, interests and causes of action, which were purely legal in their nature, and has awarded remedies which could have been adequately bestowed by a court of law. This same grand principle is one of the fundamental and essential thoughts embodied in the 'reformed system of procedure' which first appeared in New York in 1848 * * * has since extended through so many states and territories of the country * * * and was substantially adopted in England in the 'Supreme Court of Judicature Acts.' "

The court is of the opinion that the questions raised, which it is necessary to determine, are as follows:

1. The location of the common boundary line between the Irishman and the Wasp.

2. The relations of the parties as to whether or not a fiduciary relation existed between them.

3. Whether or not the defendants by reason of their mining operations carried on in the Irishman obtained knowledge of the location of the apex of the vein.

4. Whether or not the defendants on account of knowledge so obtained, and to protect the right and title to the lode on the Irishman, purchased the Wasp.

5. Whether or not the Wasp has parallel end lines so as to entitle it to extralateral rights.

6. Whether or not the defendants mined at a profit, the amount the defendants are allowed for mining and the amount of profit.

7. The several individual interests in both the Irishman and the Wasp.

8. Whether Farrell entered upon the ground and commenced mining operations as soon as practicable, and whether or not the Farrell lease was terminated.

The court is of the opinion that it is not necessary to determine whether or not the discovery vein on the Irishman and the vein on which the mining was done is the same. This is not material because the plaintiff would have the same right to said vein under either circumstance, since the plaintiff is entitled to an interest in all veins, which have their apexes within the boundaries of the Irishman lode. The only materiality would be to determine the amount of credit that should be allowed defendants for work done. There is sufficient evidence to show that Grant attempted to follow the strike of the discovery vein on the Irishman, and prospected and worked along its course, and that in so doing he discovered the mineral and vein on which the mining was done, and that in all probability one is a continuation of the other; but this work consisted of mining as well as prospecting and was done by Grant and various other persons under partnership arrangements, under which they shared in the ore extracted, and for this reason can not be allowed in the account.

Considering the first question, the location of the common side line between the Irishman and the Wasp, this depends on where the southwest corner of the Irishman was placed, since there is no dispute about the position of the northwest corner. The evidence that the southwest corner of the Irishman is at the place claimed by the plaintiff is, first, testimony of the locator (Earl Pilgrim) and predecessor in' interest of the plaintiff that he placed it there and last saw it there in June 1933; second, evidence of the plaintiff that she saw the stake at the place; third, evidence of W. W. Estes that he saw the stake there between September and November in 1928 or 1929; fourth, admission by Grant to Fred Deeming that the stake was at the place indicated;

fifth, admission by Grant to Farrell that the stake was at or near the place; sixth, admission by Grant in his statement furnished plaintiff that he was mining on the Irishman.

The foregoing is all of the direct testimony. Besides this, there is the testimony that Pilgrim built the cabin on the Irishman near the stake before any dispute arose; that the stake, at the place claimed by the defendant Grant being near the road, had never been seen by anyone until shortly before the action was commenced. Besides this, we have the fact that if the location of the stake is as claimed by the defendant it makes the Wasp approximately 670 feet wide at the widest end, the Irishman less than 420 feet wide at the southerly end, the westerly side line of the Irishman, 1,537.8 feet long, according to plaintiff's survey, and 1,487 feet long according to the defendant's survey. If the stake is located at the place claimed by the plaintiff it makes the Wasp approximately 600 feet wide at the southerly end with side lines nearly parallel, according to defendant's Exhibit "C" if scaled and the figures disregarded; it makes the Irishman 600 feet wide throughout, and the westerly side line of the Irishman, 1,471.6 feet long.

Against this we have the testimony of the defendant Grant to the effect that the southwest corner of the Irishman was expressly and purposely placed further east by himself and Pilgrim, so that they might be able thereby to include a continuation of the Ryan lode which was a long ways distant, and which according to plaintiff's Exhibit No. 22 was headed further west. In any event it does not seem reasonable that a person should attempt to include a lode coming from a distance by drawing in one side line and making his claim 470 feet wide, where he had located and was entitled to a claim 600 feet wide, and could not possibly gain anything by making the claim narrower. Besides this, there was some evidence offered of a fire having occurred at the place where the stake was claimed to have been placed by the defendant, to the effect that the stake was already

there when the fire occurred. But the plaintiff offered evidence to show that the stake had been burned before it was placed in that location, and that the stake, according to the burned moss, was put in that position after the fire occurred.

As further evidence that the Irishman is at the place claimed by the plaintiff, it was shown that the locator of the Irishman, Earl R. Pilgrim, had previously located the Moon Shine Lode on July 23, 1926, at which time there was another claim at the present location of the Irishman, and the westerly side line of that claim was made identical with the easterly side line of the Moon Shine Claim. In the certificate of location of the Moon Shine Lode, which was introduced in evidence and marked defendant's Exhibit "A", there was a tie to the highway. If we adopt the location of the Irishman as claimed by the plaintiff and place the Moon Shine Claim alongside on the westerly side, and then make the tie contained in the location certificate, we find that it fits perfectly.

 Considering the testimony, the court is of the opinion that the southwest corner of the Irishman is at the place claimed by plaintiff and that the westerly side line of the Irishman is described as follows: Commencing at the southwest corner of the Irishman No. 1 Lode Claim, which corner bears N. 30°04′ W 660.7 ft. distant from the SE corner of said Irishman claim, which said SE corner bears N. 8°01′ E 1633.2 ft. distant from corner No. 3, Survey #847; thence N. 33°04′ E 1471.6 ft. to NW corner Irishman No. 1 Lode Claim.

The next three questions should be considered together. The plaintiff and defendants were and are tenants in common, the plaintiff owning one-half interest and the defendants and Farrell owning the other half of the Irishman. The tenancy, however, was created by different instruments, and at the time that the defendant Grant started

independent operations there was hostility between said Grant and Earl Pilgrim, the predecessor in interest of the plaintiff.

The evidence shows that several shafts were sunk which were first started by the defendant Grant, and the work was thereafter continued by all the defendants. While they were working in a shaft on the Irishman Lode they encountered an ore body on the Irishman 90 or 100 feet beneath the surface near the westerly side line of the Irishman, that dipped towards the east, and it was easily discernible that if said ore body continued upward for any distance, the apex of the same would be in ground lying to the westerly of the Irishman. On or about this time—the exact time is not shown—it was first contended by the defendants that the location of the shaft and ore thus found was not on the Irishman but was on the Wasp, and the defendants contended, and still contend, that the plaintiff had no right in the Wasp. Therefore the workings of the defendants, which were below the surface on the Irishman, were not accessible to the plaintiff, and the defendants procured knowledge in operations carried on on the Irishman that was not available to the plaintiff, their co-owner. The general rule on this subject is as follows:

Freeman, Cotenancy, Sec. 154: "A cotenant can not take advantage of any defect in the common title by purchasing an outstanding title or encumbrance, and asserting it against his companions in interest. The purchase is, notwithstanding his designs to the contrary, for the benefit of all the cotenants. The legal title acquired by him is held in trust for the others, if they choose within a reasonable time to claim the benefit of the purchase, by contributing, or offering to contribute, their proportion of the purchase money."

26 Ruling Case Law:

"Sec. 94. Persons Holding Interest in Common.—Where two persons have a community of interest, there is also a community of duty between them. So if parties are

interested together by mutual agreement, and a purchase is made agreeably thereto, neither party can exclude the other from what was intended for the common benefit; and any private benefit touching the common right which is secured by either party will turn him into a trustee for the benefit of both or all."

"96. Contracts and Transactions between Persons in Confidential Relations.—Where a person obtains the legal title to property by virtue of a confidential relation and influence, under such circumstances that he ought not, according to the rule of equity and good conscience as administered in chancery, to hold and enjoy the beneficial interests of the property, courts of equity, in order to administer complete justice between the parties, will raise a trust, by construction, out of such circumstances or relations, and this trust they will fasten upon the conscience of the offending party, and will convert him into a trustee of the legal title, and order him to hold it, or execute the trust in such manner as to protect the rights of the defrauded party, and promote the safety and interests of society.

In Turner v. Sawyer, 150 U.S. 578, at page 586, 14 S.Ct. 192, at page 195, 37 L.Ed. 1189, the court says: "It is well settled that cotenants stand in a certain relation to each other of mutual trust and confidence; that neither will be permitted to act in hostility to the other in reference to the joint estate; and that a distinct title acquired by one will inure to the benefit of all. A relaxation of this rule has been sometimes admitted in certain cases of tenants in common who claim under different conveyances and through different grantors. However that may be, such cases have no application to the one under consideration, wherein a tenant in common proceeds surreptitiously, in disregard of the rights of his cotenants, to acquire a title to which he must have known, if he had made a careful examination of the facts, he had no shadow of right. We think the general rule, as stated in Bissell v. Foss, 114 U.S. 252, 259, 5 S.Ct. 851 [29 L.Ed. 126], should apply; that 'such a purchase

(of an outstanding title or incumbrance upon the joint estate for the benefit of one tenant in common) inures to the benefit of all, because there is an obligation between them, arising from their joint claim and community of interest; that one of them shall not affect the claim to the prejudice of the others.' "

In Franklin Min. Co. v. O'Brien, 22 Colo. 129, 43 P. 1016, 1018, 55 Am.St.Rep. 118, the rule is applied to the purchase of a senior conflicting claim, and we see no difference between this and the purchase of a junior claim having the apex of the vein first discovered on or in the senior claim. The court holds: "It is true, also, that each one of these mining claims is, in law, a different thing from either of the others. Buying a title, therefore, in one of the senior claims, is not literally buying in an outstanding title of the Franklin claim. But to permit a tenant in common of the Franklin claim to buy in the title of a senior conflicting mining location, and assert it against his cotenant in the junior claim, would certainly prejudice his cotenant; for, if this could be done, the title of the latter as to the conflicting ground would thus be as effectually extinguished as if the patent to the junior location itself were obtained, with hostile intent, by the tenant, and successfully asserted against the cotenant. The reason for the application of the rule in the one case is as forcible as in the other, and to draw any such distinction as is here claimed with respect to cotenancy in mining claims would be to sacrifice substance for shadow, and enable gross wrongs to be perpetrated, contrary to the principle which gives life to the rule."

See, also, Rothwell v. Dewees, 2 Black 613, 67 U.S. 613, 17 L.Ed. 309; Stevens v. Grand Central Min. Co., 8 Cir. 133 F. 28, 30; Kline v. Wright, D.C., 42 F.2d 927, 928; Cedar Canyon Consol. Min. Co. v. Yarwood, 27 Wash. 271, 67 P. 749, 91 Am.St.Rep. 841.

The defendants have cited the case of Hodgson v. Federal Oil Co., 274 U.S. 15, 47 S.Ct. 502, 503, 71 L.Ed. 901, 54 A.L.R. 869, to the effect that if no fiduciary relationship

is shown between co-owners, or tenants in common, the rule does not apply. The case holds that this fiduciary relationship does not necessarily arise from the cotenancy. This is perhaps the leading case, and holds: "This has not been done, unless such a relationship necessarily arose because of cotenancy. The rule as commonly stated forbids a cotenant from acquiring and asserting an adverse title against his companions because of the mutual trust and confidence supposed to exist; but the rule does not go beyond the reason which supports it. If the interests of the cotenants accrue at different times, under different instruments, and neither has superior means of information respecting the state of the title, then either, unless he employs his cotenancy to secure an advantage, may acquire and assert a superior outstanding title, especially where there is no joint possession."

We are of the opinion that this rule of fiduciary relationship between cotenants should not be relaxed in the case of mining properties, for the reason that the workings in connection with mines are frequently far beneath the surface and are known only to those in immediate charge. Therefore, any one working a mine has superior means of information respecting the work being carried on, the dip of the lode, and consequently the right to mineral which depends on the location of the apex. If this case is not strictly within the general rule, the conduct of the defendants, including their claim that the shaft and workings were not on the Irishman, brings it within the exception. And we are of the opinion that the defendants in this case employed their cotenancy to secure an advantage over the plaintiff while they denied her right to part of the claim; that, therefore, a fiduciary relationship existed between the plaintiff and the defendants; that the defendants, by reason of the mining operations carried on on the Irishman as aforesaid, obtained knowledge that the apex of the vein they were working on was on the claim lying to the westward of the Irishman, and that the defendants on account of the knowl-

edge so obtained, and to protect their right and title to the lode on the Irishman, purchased the Wasp, and that therefore the defendants hold a half interest in the Wasp in trust for the plaintiff, and should account to the plaintiff for the ore taken therefrom.

The fifth, the next question to be considered, is whether or not the Wasp has parallel end lines so as to entitle it to extralateral rights. If the court is right in its opinion to the effect that a trust should be established in favor of the plaintiff in the Wasp, the matter of parallel end lines is of no importance. If, however, the court is in error in this regard, it becomes important to determine to which claim the ore belonged that was mined by the defendants.

Presumptively the locator or patentee is the owner of all ore found under his surface, and the burden of proof to the contrary is on the extralateral claimant. Liberty Bell Co. v. Smuggler Co., 8 Cir., 203 F. 795.

The evidence shows that practically all the ore mined was mined from underneath the surface of the Irishman claim, as herein established; that ore has been stoped out for a distance of approximately 150 feet; that for 101 feet the apex of the vein stoped reaches beyond the westerly side line of the Irishman claim; that the vein enters the easterly side line of the Wasp, continues in the Wasp for approximately 100 feet and then returns through said side line to the Irishman.

There is no evidence as to what percentage of the ore mined was taken from underneath the Irishman and what percentage was taken from underneath the Wasp. From the evidence it is apparent that only a small portion was taken from underneath the Wasp. The court is of the opinion that the burden was on the defendants to show this, and if the defendants have comingled the ore which belonged to the defendants and plaintiff with ore that did not belong to the plaintiff, they are accountable to the plaintiff for the whole of the ore.

■■■ The evidence shows that the westerly side line of the Wasp is 1,206 feet long, and that the easterly side line of the Wasp is 1,135 feet long; the northerly end line 621.5 feet and the southerly end line 673 feet. From the foregoing it is clear that the end lines of the Wasp are not parallel, or even substantially parallel, and that the Wasp in its present condition is not entitled to extralateral rights. The location notice of the Wasp was not introduced in evidence. Since the burden of proof is on the defendants to show parallel end lines, the court can not assume that the location notice would show anything different than the map offered by the defendants, defendants' Exhibit "C". The court, therefore, is of the opinion that the Wasp in its present condition is not entitled to extralateral rights. It may be contended that the Wasp, not having extralateral rights nor parallel end lines, is not an outstanding title to the lode found on the Irishman. The owners of the Wasp are allowed, however, as a matter of law, to make their end lines parallel at any time they so desire, and from that time on the Wasp will be entitled to extralateral rights. And for this reason the court is of the opinion that it was an outstanding title and that the purchase of the Wasp inured to the benefit of the plaintiff.

In Jim Butler Mining Co. v. West End Mining Co., 247 U.S. p. 450 at 453, 38 S.Ct. 574, at page 575, 62 L.Ed. 1207, the court holds:

"These shortened lines are not only parallel, but straight. Are they the end lines of the claim in the sense of the statute? Or do its end lines consist of the shortened lines and the diagonal lines? End lines in the sense of the statute are those which are laid across the vein to show how much of it, in point of length, is appropriated and claimed by the miner. All other lines are side lines. True, the end lines must be both parallel and straight, Rev.Stat. §§ 2320, 2322, [30 U.S.C.A. §§ 23, 26], Walrath v. Champion Mining Co., 171 U.S. 293, 311, 18 S.Ct. 909, 43 L.Ed. 170. But it is not so with the side lines. They may have angles and

elbows and be converging or diverging, so long as their general course is along the vein and the statutory restriction on the width of claims is respected. Del Monte Mining Co. v. Last Chance Mining Co., 171 U.S. 55, 84, 18 S.Ct. 895, 43 L.Ed. 72. * * *

"It is well to remember, that this court has indicated in other mining cases, that to take from the discoverer a portion of that which he has discovered and give it to one who may have been led to make an adjoining location by a knowledge of the discovery is unreasonable."

The sixth question, whether or not the defendants mined the ore at a profit, the amount that the defendants are allowed for mining and the amount of profit in which the plaintiff has an interest. It is apparent from the account made by defendants that the ore was mined at a profit. The question as to what amount the defendants are allowed for the mining to a large extent depends upon the rules of law covering this matter.

Silver King Coalition Mines Co. v. Silver King Consolidated Mines Co., 8 Cir., 204 F. 166, 179, in which the court holds:

"These and other authorities have been examined, but they fail to disclose any settled rule of law to the effect that a cotenant, who lawfully extracts the ore from the common property and sells it, is deprived, in his accounting with his cotenant, by his preconceived intent to appropriate all the proceeds thereof to himself, of any allowance for the necessary and reasonable expense of extracting, preparing, and marketing the ore. In Sweeney v. Hanley, [9 Cir.] 126 F. 97, 103, 61 C.C.A. 153, 159, and Foster v. Weaver, 118 Pa. 42, 12 A. 313, 4 Am.St.Rep. 573, cotenants who had first fraudulently obtained from their fellows conveyances of their shares of the common property, and thereafter had extracted the mineral from it, were denied an allowance for their labor and expense. The courts held that the complainants were entitled to the en-

hanced value of their shares of the mineral extracted and sold by the defendants while the complainants were fraudulently dispossessed by them, without any deduction or allowance for the labor and expense of mining or marketing. In those cases the intentional and fraudulent dispossession of the defendants was first effected, and it characterized and rendered unlawful the subsequent acts of the defendants. In the case in hand, however, the intent of the defendant to appropriate all the proceeds of the ore to its own use did not render its entry upon the common property, or its extraction and preparation of the ore for market, unlawful. In this extraction, preparation, and sale it was not a trespasser. It was not acting without right. It was the owner of one half of every particle of the ore in its own right, and of the other half when extracted as trustee for its cotenant. It had the right to extract and sell the ore, in order that it might obtain its share of its value; and if it had accounted for and paid over to its cotenant in due time its part of the proceeds of the sales, no one would be so bold as to claim that it was not entitled to a just allowance for the reasonable expense of mining it, preparing it for the market, and selling it.

"In an accounting by a trustee in equity, the basic principle is that the account should be so stated that the trustee shall make no profit from his use of the property of the cestui que trust, and that the latter shall receive the just value of his property and . its income. Other equitable rules and principles inform and guide the conscience of the chancellor; but their application to the particular facts of each case is necessarily and wisely left largely to his discretion, to use them in such a manner as to work out the fundamental principle that governs the accounting. * * *

"But an evil intent does not make a rightful act wrongful, or an owner of property in its lawful possession a trespasser thereon (Stevenson v. Newman, 13 C.B. 285, 297; Allen v. Flood (1898) App.Cas. 114, 123), or necessarily subject a cotenant who extracts ore from the common property to the measure of damages for a willful trespass. It

was a trustee for the complainant of its share of the ore it took, and of the proceeds thereof. As such trustee it violated its duty to notify its cotenant of its entry and taking of the ore, its duty to keep the ore separate, its duty to keep an account of it and of its proceeds, and its duty promptly to account for and pay to its cotenant its just share of the proceeds of the ore. Nevertheless, when this matter came to an accounting in the court below, the duty still rested upon the chancellor so to apply the rules and principles of equity jurisprudence to this accounting that the complainant should receive its just share of the value of the ore, or of its proceeds, and the defendant should make no profit by its breaches of trust.

"The general and just rule is that a cotenant, in exclusive possession of mining property, who extracts and sells the ore, may charge against its proceeds the reasonable and necessary expense of its extraction and marketing. Lindley on Mines, 790, p. 990; Appeal of Fulmer, 128 Pa. 24, 18 A. 493, 15 Am.St.Rep. 662. The chancellor below was of the opinion that the application of this rule to the accounting in this case would yield a just and equitable result, and our review of the evidence and the arguments has led to the same conclusion. There was neither error nor mistake in allowing to the defendant the reasonable expense of mining, tramming, milling, and sampling the ore. * * *

"The defendant secretly entered the Vesuvius claim beneath its surface by means of a deep shaft, which it sunk from adjoining claims, which it owned in severalty, and, by means of levels running from this shaft, extracted the ore, mixed it with the ores it took from the claims it owned in severalty, sold the combined product, and kept all the proceeds. It kept no account of the ore which it took from the Vesuvius claim, and gave no notice to the complainant's grantor that it was extracting it, and that grantor was in ignorance of that fact until the ore was gone. * * *

"For the first-class ore the court charged the defendant with the highest monthly price it had received for ore of that class during the extraction of this ore, and it stated its account by the rule that the defendant should be made to bear the burden of any uncertainty in the proof due to its fault,"

which rule was approved by the court.

In Wolfe v. Childs, 42 Colo. 121, 94 P. 292, at page 294, 126 Am.St.Rep. 152, the court holds:

" 'That part of said expenditure was for necessary work to the actual mining of ore aforesaid; that part of said work was non-productive, and done on a part of the property remote from where the ore sold was mined, but was legitimate development and prospecting work in a part of said property that has yielded no income; that said Zobel performed personal services and expended labor and time in the course of said work of a reasonable value of $2,180.-90.' And it further finds that Zobel received from the ore extracted by himself and in royalties the sum of $9,953.06, and finds, as a conclusion of law, that he (Zobel) is entitled to retain the proceeds of the ore taken from the mine the the amount of $4,969.50 expended as aforesaid and $2,180.-90 for his personal services, and that the balance of $2,847.-70 only should be credited and paid to the respective interests in the mine; the amount so credited to the interveners being the sum of $355.97. The interveners contend that the conclusion of law announced by the court upon the facts as found by it is erroneous, for two reasons: (1) That a portion of the work, as the court expressly finds, for which such expenditure was made, was 'nonproductive and done on a part of the property remote from where the ore sold was mined'; that it was simply prospecting, that resulted in no improvement of the property or benefit to the interveners, and was a character of work for which Zobel was entitled to no credit. (2) That it erroneously allows Zobel compensation for his personal services.

"We think it is clear, from the finding of the court below, that a portion of the expenditure for which Zobel was allowed credit was made in doing work for which he was not entitled to contribution from these interveners. As was said in Stickley v. Mulrooney, 36 Colo. 242, 244, 87 P. 547, 548 [118 Am.St.Rep. 107]: 'It appears to be well settled that one co-owner, without the consent of the other co-owners, cannot demand from the co-owners who have not joined with him, or in some way given their consent to the development or prospecting in mining property, remuneration for expenses incurred in so prospecting or developing the common property.' While the operating tenant may, in case he is called upon to account for profits, set off as against a non-operating tenant the cost of the necessary improvements, he must show that such improvements were necessary, and added to and enhanced the value of the common property. A portion of the expenditure for which credit was allowed Zobel was, as we have seen, not of this character. What portion it is impossible to determine from the findings of the court; it appearing therefrom that part of the expenditure was for work which resulted in the development of the ore body which was opened at the time interveners acquired title, and in extracting such ore, which would be a legitimate offset, and a part was for prospecting and developing other parts of the mine for which he was entitled to no contribution from the interveners. It is also well settled that tenants in common are not entitled to compensation from each other for services rendered in the care and management of the common property."

Dettering v. Nordstrom, 9 Cir., 148 F. 81, 83, 2 Alaska Fed. 613, was an action brought by a tenant in common against his cotenant for ore extracted. During the trial of the case no proof was made by the cotenant who had extracted it, or of the reasonable expenses or cost of extracting the same. The court, however, during the course of the trial said:

"We will adopt the rule that you are accountable for the money value were the ground in place, with the ore in place, less the reasonable expenses of extracting the same.' * * *

"The reason why the court allowed the appellee one-fourth of the gross output of the mine is found in the fact that the appellant offered no proof of the reasonable expenses of extracting the gold dust. * * * The appellant, notwithstanding that he had set up no items of expense was entitled to prove the reasonable expenses of mining and thereby to reduce the amount payable to the appellee. * * *

"He had the right to operate the mine, but with it went the obligation to account for the output less the reasonable expenses of mining and to prove that expense the burden was upon him."

26 Ruling Case Law: "218. Trust property Mingled with that of Trustee; General Rule.—It is well settled that the mere fact that a trustee mingles the property of his cestui que trust with his own so that it can not be distinguished does not give the cestui que trust any preference over the general creditors of the trustee when he has become insolvent. On the other hand it is a long settled rule of equity that a cestui que trust may lay claim to his property which, while in the possession of a trustee, has become mingled with the property of the latter, and it makes no difference whether it is the original thing or is a product or substitute of it. As long as it is not held by a bona fide holder, the trust attaches to the property through all its mutations, and the right to follow it ceases only when the means of ascertainment fail. Consequently where an insolvent trustee has commingled the trust property with that of his own the cestui que trust may claim it as such if it is possible to identify it, either in its original or a substituted form, and thus hold it free from the claims of the general creditors."

Applying the rule as laid down in the above cases, the court is of the opinion that all work done by Grant and his former associates prior to September, 1932, should not be considered in making up this account, for the reason that said work was prospecting and mining conducted by the defendant Grant and various other persons under arrangements under which Grant and said persons were to share in the profits, and is not directly connected with the mining operations carried on after that date. The court is of the opinion that the expenditures for all work done by the defendants after August 31, 1932, to June 1933, amounting to $4,604.67, as shown by plaintiff's Exhibit No. 4, and all expenditures made by them, amounting to $28,813.74, as shown by defendants' Exhibit "S", should be credited to the defendants, making a total of $33,418.41, which includes payments made to Grant, for the reason that they were for work done by Grant, as distinguished from mere supervision of the property. The court finds that the total receipts from ore mined from August 31, 1932, to and including August 24, 1935, are $58,262.31, leaving a net profit of the operations carried on by the defendants of $24,843.90. These calculations do not include and do not take into consideration the workings of the partnership in which C. E. Farrell and the defendants herein are partners, which work was done under a lease from the defendant Grant at or near the original discovery shaft on the Irishman.

The next question to be determined is the individual interest of all parties in both the Irishman and the Wasp. The court is of the opinion that the plaintiff is the legal owner of a half interest in the Irishman, and the equitable owner of a half interest in the Wasp claim; that each of the defendants is the owner of a tenth interest in the Irishman under the assignment and agreement, plaintiff's Exhibit No. 9, executed June 26, 1924, and that prior to that time the defendant Grant owned one fourth interest, David Mutchler one-twelfth interest and John Mutchler one-twelfth interest in the Irishman. The court is of the opin-

ion that the mining operations carried on on the Irishman by the defendants towards the southerly part of the claim and near the side line of the Wasp, were carried on by the four defendants, and that Farrell was not interested in said operations. This mining was done under the claim that it was on the Wasp, in which claim each of the defendants claim to own a fourth interest, and the defendants are accountable as such and not as owners of a tenth interest, which did not arise until the agreement with Farrell, plaintiff's Exhibit No. 9, was entered into. The court is of the opinion that the four defendants owned the remaining half interest in the Wasp, and that each defendant owns an eighth interest in said Wasp claim; that the plaintiff is entitled to a decree, decreeing that each of the defendants O. M. Grant, David Mutchler and John Mutchler are trustees for the plaintiff and are each holding a one-eighth interest in the Wasp as trustees for the plaintiff, and the plaintiff is further entitled to a judgment against the defendant O. M. Grant for $3,105.49 less $37.50, plaintiff's portion, purchase price Wasp, $3,067.99; judgment against David Mutchler for $3,105.49 less $37.50, plaintiff's portion, purchase price Wasp, $3,067.99; and judgment against John Mutchler for $3,105.48, less $37.50, plaintiff's portion, purchase price Wasp, $3,067.98; with interest on said amounts from October 29, 1934, the date of filing the complaint, to June 9, 1935, at eight per cent (8%) per annum, and from June 9, 1935, to date of the decree at six per cent (6%) per annum; and an attorney's fee to be allowed as cost. The amount of attorney's fee to be determined on hearing by the court. And a further decree adjudging plaintiff to be the owner of an undivided one-half interest in each of the interests of defendants Grant, David Mutchler, and John Mutchler, in and to all improvements and equipment placed upon the Irishman and Wasp claims by the defendants, the payment for the purchase of which was included in the account rendered herein.

The eighth and last question to be considered by the court is (1) whether the Farrell lease could possibly apply

to the mining operations carried on by the defendants; (2) whether Farrell entered upon the ground and commenced mining operations as soon as practicable after obtaining the lease; and whether or not the Farrell lease was terminated.

Under the laws of Alaska a cotenant or co-owner conducting mining operations independently of his cotenant or co-owner, is accountable to such cotenant or co-owner, for profits made in the operation. Sec. 2866. It follows, therefore, that one cotenant can not limit the other to an interest in the royalty provided for in the lease.

Morrison, Mining Rights, p. 370, Lease by one Cotenant: "It has been repeatedly held that one cotenant can not give a lease of a whole mine technically binding on all the co-owners."

Independent of the above rule, Mrs. Pilgrim, the plaintiff, by her lease and option to Farrell, defendants' Exhibit "H", could not possibly lease Farrell a right that she did not have; she could only lease her right as a tenant in common to mine the Irishman No. 1 and No. 2 claims, but was absolutely without right or authority to give a lease on the cotenant Grant's right to mine the Irishman No. 1 and No. 2, which right of her cotenant Grant was co-extensive with her own right.

The plaintiff as a tenant in common with Grant had two distinct rights. First, to mine the claims; if she did this she was legally bound to account to Grant for profits made. Perhaps she had the right to grant a lease to others to mine the claims by virtue of this right. If a lease was made on a royalty basis she could not deprive Grant of his right to his share of the profits and compel him to accept part of the royalty. Grant would have a cause of action for profits made against both the lessee and the plaintiff if he insisted on profits and refused to accept his part of the royalty, under the lease. And the plaintiff had a second right by virtue of her ownership which was and is

her right to share in profits made as a result of mining operations carried on by Grant on the claims owned as tenants in common. This right she could assign as distinguished from lease. This she made no attempt to do in the lease she gave to Farrell. Therefore the lease given to Farrell does not include right to share in profits made by the operations carried on by defendants on the property owned in common. We, therefore, have considerable doubt that the lease could possibly apply to the operations under consideration, carried on by these defendants.

We are of the opinion that Farrell did not enter upon the ground covered by the lease and commenced mining operations thereon as soon as practicable after the 20th day of January, 1934, and that therefore the plaintiff had a right to terminate and declare the lease forfeited. The evidence further shows that the lease was terminated by the plaintiff before Farrell went upon the ground covered by the lease; that Farrell was orally notified of the termination and forfeiture of the lease some time previous to the time that the written notice was sent him, which oral notice was claimed to have been given him by the plaintiff before he went on the Irishman in June, 1933. Written notice was not given him before June 26, and Farrell on the same day, on June 26, 1933, gave an assignment to the defendants of this lease and he and the Mutchler brothers in turn took a lease from Grant. It would seem, and the court is of the opinion, that the oral notice given Farrell previous to his going on the land and previous to this date was the cause of him giving the assignment and taking the lease from Grant, plaintiff's Exhibit No. 9.

The plaintiff may prepare findings of fact and conclusions of law in accordance with the amended complaint and this opinion, and a decree in accordance therewith.